# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-1229

_____

281 Care Committee; Ron Stoffel; Citizens for Quality Education; Joel Brude

*Plaintiffs - Appellants*

v.

Ross Arneson, in his official capacity as County Attorney for Blue Earth County,
Minnesota, or his successor; Mike Freeman, in his official capacity as County
Attorney for Hennepin County, Minnesota, or his successor; Lori Swanson, in her
official capacity as the Minnesota Attorney General or her successor

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: February 13, 2014
Filed: September 2, 2014

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

BEAM, Circuit Judge.

On appeal for the second time,[1] Appellants challenge the district court's denial of their motion for summary judgment, its corresponding grant of summary judgment in favor of Appellees, and the court's dismissal of all claims in the complaint with prejudice. For the reasons stated herein, we reverse and remand for further proceedings consistent with this opinion.

## I.   BACKGROUND

Appellants in this action are two Minnesota-based, grassroots advocacy organizations along with their corresponding leaders.[2] Each organization was founded to oppose school-funding ballot initiatives, which Minnesota law authorizes individual school boards to propose. Appellants claim that a provision of the Minnesota Fair Campaign Practices Act (FCPA) inhibits Appellants' ability to speak freely against these ballot initiatives and, thereby, violates their First Amendment rights. Minn. Stat. §§ 211B.01 *et seq*. Appellees are two Minnesota county attorneys and the Minnesota Attorney General, all sued in their official capacities ("Appellees" or "the county attorneys").[3]

---

[1]In 281 Care Committee v. Arneson, 638 F.3d 621 (8th Cir. 2011), cert. denied, 133 S. Ct. 61 (2012) (281 Care Committee I), this court reversed the district court's dismissal of Plaintiffs' complaint, vacated the denial of Plaintiffs' motion for summary judgment, and remanded to the district court for further proceedings, which proceedings we now review.

[2]A third organization and plaintiff, W.I.S.E. Citizen Committee, has been dismissed from the lawsuit following the death of its former chairman, Plaintiff Victor Niska.

[3]Two county attorneys have likewise been dismissed from the lawsuit following this court's initial remand.

In relevant part, the challenged provision of the FCPA provides:

> A person is guilty of a gross misdemeanor who intentionally participates in the preparation, dissemination, or broadcast of paid political advertising or campaign material . . . with respect to the effect of a ballot question, that is designed or tends to . . . promote or defeat a ballot question, that is false, and that the person knows is false or communicates to others with reckless disregard of whether it is false.

Minn. Stat. § 211B.06, subd. 1. Other than a source protected by the FCPA exemption for "news items or editorial comments by the news media," anyone can lodge a claim under § 211B.06 with the Minnesota Office of Administrative Hearings (OAH) within one year after the alleged occurrence of the act that is the subject of the complaint. Minn. Stat. §§ 211B.01, subd. 2; 211B.32, subd. 2. The OAH immediately assigns an administrative law judge (ALJ) to the matter, who then determines if there is a prima facie violation and, if so, probable cause supporting the complaint. Minn. Stat. § 211B.33, subd. 1, 2. If the complaint alleging a § 211B.06 violation is filed "within 60 days before the primary or special election or within 90 days before the general election to which the complaint relates, the ALJ must conduct an expedited probable cause hearing." Minn. Stat. § 211B.33, subd. 2. If a complaint survives a probable cause assessment, the chief ALJ assigns the complaint to a three-judge panel for an evidentiary hearing, which could realistically necessitate the employment of legal counsel by the accused. Minn. Stat. § 211B.35, subd. 1. A final decision and/or civil penalty (up to $5,000) imposed by an ALJ panel is subject to judicial review. Minn. Stat. §§ 211B.35, sub.d 2(d); 211B.36, subd. 5. Only when a complaint is finally disposed of by the OAH, is it subject to further prosecution by the county attorney. Minn. Stat. § 211B.32, subd. 1. One possible resolution by the ALJ panel is to refer the complaint to the appropriate county attorney without rendering its own opinion on the matter, or in addition to its own resolution. Minn. Stat. § 211B.35, subd. 2(e).

As noted in 281 Care Committee I:

Minnesota has a long history of regulating knowingly false speech about political candidates; it has criminalized defamatory campaign speech since 1893.  However, the FCPA's regulation of issue-related political speech is a comparatively recent innovation.  Minnesota did not begin regulating knowingly false speech about ballot initiatives until 1988.  Between 1988 and 2004, the FCPA's regulation of speech regarding ballot initiatives allowed for only one enforcement mechanism: mandatory criminal prosecution of alleged violators by county attorneys.  In 2004, the Minnesota legislature amended the FCPA to provide that alleged violations of section 211B.06 initially be dealt with through civil complaints filed with the [OAH].

638 F.3d 621, 625 (8th Cir. 2011).

Upon remand from 281 Care Committee I, the district court faced various issues:  (1) a renewed challenge by Appellees to Appellants' standing on the basis of a failure of proof, (2) a decision regarding the level of scrutiny to apply to this First Amendment action, and (3) whether the Minnesota statute survived under such an analysis.  As to the first issue, the county attorneys argued that even if Appellants sufficiently alleged standing at the motion to dismiss stage, they failed to prove standing sufficient to survive summary judgment because they failed to identify a specific ballot initiative they intended to oppose, nor had they, argued Appellees, provided examples of statements they intended to use (i.e., failure of proof).  The district court held that this circuit's prior conclusion–that Appellants had standing because a credible threat of prosecution existed by virtue of the recent enactment of § 211B.06–persisted at the summary judgment stage, and thus the court rejected Appellees' argument as to the first issue.

Regarding the appropriate level of scrutiny to apply in this action, even though this court in 281 Care Committee I directed the district court to apply strict scrutiny upon remand, 638 F.3d at 636, the district court determined that the intervening Supreme Court opinion, United States v. Alvarez, 132 S. Ct. 2537 (2012), altered the landscape. Discussing Alvarez, the district court noted that the four-Justice plurality, led by Justice Kennedy, applied strict scrutiny and found the Stolen Valor Act unconstitutional. The district court accurately noted that Justice Breyer wrote a concurring opinion in Alvarez, joined by Justice Kagan, in which he agreed that the Stolen Valor Act was unconstitutional but arrived at that holding applying intermediate, not strict, scrutiny. See Alvarez, 132 S. Ct. at 2551-56 (Breyer, J., concurring). Appellees argued to the district court that Justice Breyer's concurrence controlled in Alvarez because when "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193 (1977) (internal quotation omitted). Accordingly, applying the Marks rule, Appellees argued that the appropriate level of scrutiny to apply in this case is intermediate scrutiny. The district court agreed that intermediate scrutiny applied according to Alvarez, but conducted its determinative analysis applying strict scrutiny because the court held that no matter the level of scrutiny, Minnesota Statute § 211B.06 survives even the most stringent.

Applying a strict scrutiny analysis to the instant facts, the district court held § 211B.06 serves a "compelling interest" (i.e., preserving fair and honest elections and preventing a fraud upon the electorate through the deliberate spreading of material, false information) and that, on balance, that interest was important enough to justify the speech § 211B.06 has restricted in pursuit of that interest. This appeal followed.

## II.     DISCUSSION

### A.     Standard of Review

"This court reviews de novo a grant of summary judgment." Iowa Right to Life Comm., Inc. v. Tooker, 717 F.3d 576, 583 (8th Cir. 2013), cert. denied, 134 S. Ct. 1787 (2014).  "This court affirms where there are no genuine issues of material fact, and judgment is appropriate as a matter of law." Minn. Citizens Concerned for Life, Inc. v. Kelley, 427 F.3d 1106, 1109 (8th Cir. 2005).

### B.     Standing

We first dispose of the county attorneys' claim that the district court erred in its conclusion that Appellants had standing to pursue their claims at summary judgment.  In 281 Care Committee I, this court held that Appellants had standing, in part, because a credible threat of prosecution existed by virtue of the recent enactment of § 211B.06.  638 F.3d at 627-31.  Upon remand, the county attorneys revisited that claim.  Before the district court, the county attorneys argued that Appellants lacked standing due to a failure of proof on that issue–that Appellants failed to offer specific facts to support standing at summary judgment.  For example, the county attorneys claimed Appellants failed to identify a specific ballot initiative they intended to oppose nor did they provide examples of specific statements they intended to use.

Despite the fact that Appellants filed declarations describing their opposition to particular ballot initiatives, the county attorneys maintain that the posited statements "are beyond the reach of the statute" and appear to be exaggerations, conjecture, or illogical inferences that, according to the county attorneys, are not within the scope of the statute.  Thus, the county attorneys argue, no threat of prosecution actually exists, nor does § 211B.06 create any objectively reasonable chill on Appellants' speech.  And, to the extent that the proposed statements contain

verifiable facts, the county attorneys further claim that Appellants would not face liability under § 211B.06 unless (1) the statements are false, (2) the speaker made such statements in paid political advertising or campaign material, and (3) the speaker had knowledge of their falsity, or made the statements with reckless disregard for their truth or falsity. Until all three occur, argue the county attorneys, there exists no objectively reasonable chill on protected political speech.

The county attorneys additionally revisit a previous claim that Appellants are not pursuing claims against their political opponents who might file a complaint under § 211B.06 with the OAH, but rather against the county attorneys charged with criminal prosecution in the unlikely event the OAH refers a matter for criminal investigation. They claim that by limiting the suit against those who may at some unlikely point seek prosecution, the claims are too farfetched to reasonably chill Appellants' speech. Overall, the county attorneys claim Appellants have not offered sufficient evidence of an injury-in-fact caused by § 211B.06. Faced with the renewed standing challenge at summary judgment, the district court held that the reasoning of 281 Care Committee I prevailed and was unchanged by the case's progression. We agree.

Briefly, standing is always a "threshold question" in determining whether a federal court may hear a case. Eckles v. City of Corydon, 341 F.3d 762, 767 (8th Cir. 2003) (quotation omitted). To assert a right in federal court a party invoking federal jurisdiction must establish "(1) that he suffered concrete, particularized injury in fact, (2) that this injury is fairly traceable to the challenged action of defendants, and (3) that it is likely that this injury will be redressed by a favorable decision." 281 Care Committee I, 638 F.3d at 627. To establish injury in fact for a First Amendment challenge to a state statute, "the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the

-7-

existence of the statute. Self-censorship can itself constitute injury in fact." Id. "The relevant inquiry is whether a party's decision to chill his speech in light of the challenged statute was 'objectively reasonable.'" Id. (quoting Zanders v. Swanson, 573 F.3d 591, 594 (8th Cir. 2009)). "Reasonable chill exists when a plaintiff shows 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution.'" Id. (alteration in original) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

We rely almost exclusively on our disposition in 281 Care Committee I to resolve this revisited claim and offer little additional reasoning at this stage in support of our rejection of the county attorneys' challenge to standing. Id. at 27-31 (determining that § 211B.06 presents a credible threat of prosecution sufficient to support a claim of objectively reasonable chill and that the plaintiffs have reasonable cause to fear the consequences of § 211B.06, as they alleged that they wish to engage in conduct that could reasonably be interpreted as making false statements with reckless disregard for the truth of those statements). To that end, we reiterate even now at the summary judgment stage, that the relevant facts have not changed and Appellants' decision to chill their speech was objectively reasonable given a credible threat of prosecution and that the conduct alleged by Appellants in which they wish to engage could fall within the prohibition of § 211B.06. See 281 Care Committee I, 638 F.3d at 627-29.[4]

_____

[4]We also deny the county attorneys' request to conduct additional discovery pursuant to Federal Rule of Civil Procedure 56(d), as we have now reiterated that there is no need for additional inquiries on this issue. Lest there be any need for further clarification on the matter, the Supreme Court's discussion in Susan B. Anthony List v. Driehaus, should settle it pointedly. Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334 (2014) (SBA List).

The Court's recent pronouncement in SBA List solidifies our instant *and* prior rulings on the county attorneys' standing challenge and actually represents a timely discussion directly relevant to our approach herein to Minnesota's § 211B.06. 134 S. Ct. 2334 (2014). In SBA List, the Court addressed a sort of "sister statute," part of the Ohio statutory scheme, that is quite similar to § 211B.06,[5] and is also traveling a similar path in litigation.[6] The posture in SBA List is similar to that which we faced in 281 Care Committee I. In SBA List, the Court faced a challenge to a party's Article III standing. The petitioners in SBA List were advocacy organizations that made a preenforcement challenge on constitutional grounds against the Ohio law that prohibits certain false statements during the course of any campaign for nomination

_____

[5]In fact the OAH procedure in Minnesota under its Fair Campaign Practices "is modeled on one created by Ohio in 1995." Appellee App. 14.

[6]Ohio Revised Code Annotated § 3517.21(B), part of the Ohio Election Code, provides in relevant part:

> No person, during the course of any campaign for nomination or election to public office or office of a political party, by means of campaign materials, including sample ballots, an advertisement on radio or television or in a newspaper or periodical, a public speech, press release, or otherwise, shall knowingly and with intent to affect the outcome of such campaign do any of the following: . . . (9) Make a false statement concerning the voting record of a candidate or public official; (10) Post, publish, circulate, distribute, or otherwise disseminate a false statement concerning a candidate, either knowing the same to be false or with reckless disregard of whether it was false or not, if the statement is designed to promote the election, nomination, or defeat of the candidate.

or election to public office or to an office of a political party.  SBA List, 134 S. Ct. at 2338.  The Sixth Circuit affirmed the dismissal of the action, but a unanimous Supreme Court reversed.  Id. at 2347.

The Court in SBA List held that despite the prior courts' determinations that the case was not ripe because the petitioners had not alleged a credible threat of enforcement, such a threat indeed existed.  Id. at 2343-45.  Like § 211B.06, the Ohio false statements law sweeps broadly and covered the intended speech of the SBA List petitioners, even though they fully intended to speak truthfully, just as the Appellants assert here.  Id.  Despite the organizations' intentions, the Court held, the reviewing administrative body where complaints could be lodged as part of the statutory scheme could *still* find probable cause to believe the law was violated.  Id. at 2344-45.  The real injury was the filing of a complaint itself, the Court realized, and that threat was only exacerbated by the procedure in place in Ohio where "any person" could file such a complaint.  Id. at 2345.  The Court recognized that in such a scheme, the filing of the complaint itself can be used to tactically diffuse an organization's support during, say, the heat of a campaign and *that* threat, coupled with burdensome Commission proceedings and an additional threat of criminal prosecution more than suffice to create an injury for standing purposes. Id. at 2345-47.

The instant matter, too, is justiciable, and as to this specific statute, there is sufficient factual support to find an Article III injury in fact.  Appellants claim they plan to continue to engage in electoral speech concerning opposition to school-funding ballot initiatives.  As in SBA List, Appellants' challenge to the Minnesota false statements statute presents a purely legal issue fully supported by the facts at hand, and denying this judicial review would impose a substantial hardship on Appellants, "forcing them to choose between refraining from core political speech on the one hand, or engaging in that speech and risking costly [OAH] proceedings and

-10-

criminal prosecution on the other." Id. at 2347. Accordingly, we reject the county attorneys' renewed challenge to standing.

## C. Scrutiny

"As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Alvarez, 132 S. Ct. at 2543 (plurality) (quotation omitted). To evaluate whether a statute violates the First Amendment, the first step is to articulate the level of scrutiny to apply in this court's analysis–i.e., the standard on which this court examines the fit between the statutory ends and means. Id. at 2551 (Breyer, J., concurring); see also Wersal v. Sexton, 674 F.3d 1010, 1019-20 (8th Cir. 2012). The parties hotly dispute the level of scrutiny to apply here, including a vibrant discussion as to whether, and how, Alvarez applies. The district court and now Appellees advocate that Alvarez is the guidepost for our analysis regarding the constitutionality of § 211B.06, and instructs that we apply intermediate scrutiny in this case. However, while Alvarez dealt with a content-based restriction on protected speech, the restriction at issue in Alvarez did *not* regulate political speech, the key factor in the instant analysis. Alvarez, 132 S. Ct. at 2543, 2548 (plurality). Accordingly, Alvarez is not dispositive.

In Alvarez, the Supreme Court analyzed a First Amendment challenge to the Stolen Valor Act, which criminalized false claims about the receipt of military decorations or medals. Id. at 2542-43 (plurality). Specifically, the defendant, Alvarez, lied in announcing he held the Congressional Medal of Honor and he was indicted under the Stolen Valor Act for doing so. Id. at 2542 (plurality). In arriving at the conclusion that the Stolen Valor Act as written violated the First Amendment, four Justices applied strict scrutiny and the two concurring Justices applied

-11-

intermediate scrutiny.[7] Despite the disagreement over the level of scrutiny to apply, however, all six Justices in <u>Alvarez</u> agreed that false statements do *not* represent a category of speech altogether exempt from First Amendment protection. <u>Id.</u> at 2544-45, 2553 (plurality and Breyer, J., concurring). Simply stated, false statements, as a general proposition, are not beyond constitutional protection.[8] <u>Id.</u> Like the Stolen Valor Act, § 211B.06 targets falsity, as opposed to the legally cognizable harms

---

[7]The <u>Alvarez</u> plurality utilized the term "the most exacting scrutiny" in its analysis. 132 S. Ct. at 2548 (plurality) (quotation omitted). To be sure, the Supreme Court has used the term "exacting scrutiny" in many contexts, some of which indicate the application of a less-than-strict scrutiny approach. <u>See, e.g.</u>, <u>Minn. Citizens Concerned for Life, Inc. v. Swanson</u>, 692 F.3d 864, 876 (8th Cir. 2012) (discussing various cases utilizing the "exacting scrutiny" standard and how it was applied). In <u>Alvarez</u>, though, no matter the cloudiness of its usage in prior case law, the plurality's application of "the most exacting scrutiny" is interchangeable with strict scrutiny. 132 S. Ct. at 2551 (Breyer, J., concurring) (applying the less vigorous, intermediate scrutiny, approach in the analysis, in distinct contrast to the plurality's strict scrutiny approach).

[8]In this same vein, <u>Alvarez</u> likewise forecloses Appellants' argument (made in reliance upon language found in <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 291 (1964)) that because § 211B.06 "imposes criminal and civil liability on citizens based solely on statements criticizing the government's laws or proposed laws, it is categorically unconstitutional." Just as we previously illuminated why defamation-law principles advance the importance of private interests but do not settle the question regarding a categorical exemption for knowingly false speech, <u>281 Care Committee I</u>, 638 F.3d at 634, <u>Sullivan</u>'s discussion of liability for the defamation of a public official likewise does not settle the matter here. <u>See Sullivan</u>, 376 U.S. at 271-72, 279-80. <u>Sullivan</u> certainly furthers the discussion concerning the importance of enforcing the First Amendment to advance free debate and robust public discussion of issues, but the Court's discussion in <u>Sullivan</u> does not support the proposition that § 211B.06 is categorically unconstitutional. <u>Id.</u> at 270-72.

associated with a false statement. In this arena, the Court makes clear that there is no free pass around the First Amendment. Id. at 2545 (plurality).[9]

The key today, however, is that although Alvarez dealt with a regulation proscribing false speech, it did not deal with legislation regulating false *political* speech. Id. at 2543 (plurality). This distinction makes all the difference and is entirely the reason why Alvarez is not the ground upon which we tread. Justice Breyer in his concurring opinion in Alvarez recognized the significant difference between the false speech regulated by the Stolen Valor Act and other areas of false speech, including false political speech, acknowledging that strict scrutiny is often the test to apply, and noting that almost no amount of fine tailoring could achieve a similar government interest in a political context:

> I recognize that in some contexts, particularly political contexts, such a narrowing will not always be easy to achieve. In the political arena a false statement is more likely to make a behavioral difference (say, by leading the listeners to vote for the speaker) but at the same time criminal prosecution is particularly dangerous (say, by radically changing a potential election result) and consequently can more easily result in censorship of speakers and their ideas.

---

[9]The Court's ruling on this issue affirms the pronouncement in 281 Care Committee I that knowingly false speech does not fall outside the protections of the First Amendment. 638 F.3d at 635. The district court seems to have read this pronouncement as the sum total of our ruling on the issue of scrutiny on remand because the court deduced it was "thus directed" to apply strict scrutiny only because the statute was a content-based restriction on knowingly false speech. However, 281 Care Committee I makes clear that its discussion focuses on false statements in the political context, specifically "in the context of political campaigns on a ballot issue." Id. at 636. It was for *that* reason, we held strict scrutiny applied. Id. at 635-36.

-13-

Id. at 2556 (Breyer, J., concurring).  Alvarez, of course, guides our analysis to the extent it discusses the regulation of false speech in light of general First Amendment protections, but the Court's pronouncements in the myriad other cases discussing the regulation of political speech dictate the level of scrutiny to apply to our analysis. McCutcheon v. FEC, 134 S. Ct. 1434 (2014); Citizens United v. FEC, 558 U.S. 310, 340 (2010); Republican Party of Minn. v. White, 536 U.S. 765, 774 (2002) (White I); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347 (1995); Mills v. Ala., 384 U.S. 214, 218-19 (1966).

So, again, it is *key* that the regulatory scheme at play in Alvarez dealt entirely, and only, with false speech.  Alvarez, 132 S. Ct. at 2545 (plurality) ("[T]he Stolen Valor Act . . . targets falsity and nothing more.").  In fact, it was largely (if not solely) because the regulation at issue in Alvarez concerned false statements about easily verifiable facts that did not concern subjects often warranting greater protection under the First Amendment, that the concurring Justices applied intermediate scrutiny.  Id. at 2552-53 (Breyer, J., concurring).  Here, because the speech at issue occupies the core of the protection afforded by the First Amendment, we apply strict scrutiny to legislation attempting to regulate it.  Iowa Right to Life Comm., 717 F.3d at 589. Accordingly, because Alvarez does not alter the landscape on this issue, the scrutiny directed in 281 Care Committee I endures.

**D.     Regulation of Political Speech**

The First Amendment of the United States Constitution states: "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  The regulation of political speech or expression is, and always has been, at the core of the protection afforded by the First Amendment.  McIntyre, 514 U.S. at 346.  "Political speech is the primary object of First Amendment protection and the lifeblood of a

-14-

self-governing people." McCutcheon, 134 S. Ct. at 1462 (Thomas, J. concurring) (internal quotations omitted). It is, particularly, at the heart of the protections of the First Amendment, 281 Care Committee I, 638 F.3d at 635, and is, "of course, . . . at the core of what the First Amendment is designed to protect." Morse v. Frederick, 551 U.S. 393, 403 (2007) (internal quotation omitted). "Although not beyond restraint, strict scrutiny is applied to any regulation that would curtail it." Republican Party of Minn. v. White, 416 F.3d 738, 749 (8th Cir. 2005) (en banc) (White II); see also McIntyre, 514 U.S. at 347.

Much legal discourse has taken place regarding the special place held for political discussion in our system of government, and the application of these principles, usually discussed in the context of speech surrounding candidates for office, "extend[s] equally to issue-based elections such as [political campaigns on a ballot issue]." McIntyre, 514 U.S. at 347. So,

> [d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Although First Amendment protections are not confined to the exposition of ideas, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, of course including discussions of [political campaigns on a ballot issue]. This no more than reflects our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.

-15-

Id. at 346 (quotation and internal quotations omitted); see also Mills, 384 U.S. at 218-19. Applying strict scrutiny, the burden on Appellees in this matter is to demonstrate that the interest advanced in support of the § 211B.06 is narrowly tailored to meet a compelling government interest. 281 Care Committee I, 638 F.3d at 636.

### E.     Statutory Ends and Means

The county attorneys are unable to meet their burden in this case. Even if we were to assume that the asserted compelling interests discussed herein pass muster for purposes of this constitutional analysis, no amount of narrow tailoring succeeds because § 211B.06 is not necessary, is simultaneously overbroad and underinclusive, and is not the least restrictive means of achieving any stated goal. We explain.

#### 1.     Compelling Interest

"Precisely what constitutes a 'compelling interest' is not easily defined. Attempts at definition generally use alternative, equally superlative language: 'interest[] of the highest order,' 'overriding state interest,' 'unusually important interest.'" White II, 416 F.3d at 749 (quoting Wisconsin v. Yoder, 406 U.S. 205, 215 (1972); McIntyre, 514 U.S. at 347; Goldman v. Weinberger, 475 U.S. 503, 530 (1986) (O'Connor, J., dissenting)). Too, the discussion regarding whether a state interest is compelling or not bottoms on other considerations in the strict scrutiny analysis, such as the impact of the regulation itself.

> The inquiry of whether the interest (the end) is 'important enough'–that is, sufficiently compelling to abridge core constitutional rights–is informed by an examination of the regulation (the means) purportedly

addressing that end. A clear indicator of the degree to which an interest is 'compelling' is the tightness of the fit between the regulation and the purported interest: where the regulation [is underinclusive and] fails to address significant influences that impact the purported interest, it usually flushes out the fact that the interest does not rise to the level of being 'compelling.' If an interest is *compelling* enough to justify abridging core constitutional rights, a state will enact regulations that substantially protect that interest from similarly significant threats. . . . A law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon . . . speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.

White II, 416 F. 3d at 750 (internal quotation omitted) (second and fourth alterations in original). That said, and looking at all of these related factors, we analyze the compelling state interest advanced in this case.

The district court[10] concluded that the major purpose of § 211B.06 is to

---

[10]Appellees do not espouse just one articulation of the state interest advanced by § 211B.06. Instead they articulate many versions of a similar theme. In their briefing on appeal, the county attorneys intimate that the interests advanced in *other* cases suffice to articulate the state's interest behind § 211B.06 here, quoting previously discussed interests in "preventing fraud and libel," "protecting the political process from distortions caused by untrue and inaccurate speech," "the evil of making false statements of fact regarding an election," and, finally, that § 211B.06 "is designed to prevent corrupt campaign practices that would mislead the public and permit close elections to be won by fraud." See generally McIntyre, 514 U.S. at 349; Brown v. Hartlage, 456 U.S. 45, 61 (1982); Kennedy v. Voss, 304 N.W.2d 299, 300 (Minn. 1981); and In re Contest of Gen. Election, 264 N.W.2d 401, 406 (Minn. 1978) (Otis, J., dissenting). In the interest of uniformity, because the theme remains the same, and the particular articulation of the state interest advanced is not determinative in the analysis, we refer in our analysis to the district court's articulation of the

-17-

preserve fair and honest elections and prevent a fraud on the electorate. The district court additionally articulated that the purpose of § 211B.06 is to "implement[] minimal, narrowly tailored safeguards against campaigns of misinformation," and to "[l]imit[] the dissemination of knowingly or recklessly false statements about the effects of ballot initiatives," because "[d]eliberate or reckless efforts to mislead the public and change the outcome of a ballot measure not only have an adverse impact on the issue being decided, [they] undermine the premises of democratic government, including the necessity of free but fair debates."

Despite the strong protection for political speech under the First Amendment, the Supreme Court has acknowledged that a state interest in preventing fraud "carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large." McIntyre, 514 U.S. at 349. It is true that "[a] State indisputably has a compelling interest in preserving the integrity of its election process." Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 231-32 (1989) (discussing several laws the Court has held furthered a state's interest in preserving the integrity of its election *process*, all of which exerted an infringement on the associational rights of the citizenry as an indirect consequence of laws necessary to the successful completion of a party's external responsibilities in ensuring the order and fairness of elections). And, interests in protecting elections conducted with integrity and reliability "obviously are compelling." Burson v. Freeman, 504 U.S. 191, 199 (1992) (reiterating the Court's view that a state has a compelling interest in ensuring that an individual's right to vote is not undermined by fraud in the election process, and reconciling the accommodation of the right to engage in political discourse with the right to vote). Yet, when these preservation goals are achieved at the expense of public discourse, they become problematic. "[A]

interest advanced by § 211B.06.

-18-

State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." Eu, 489 F.3d at 228 (quotation omitted).  We are thus ever-cognizant in this analysis of the significant First Amendment costs for individual citizens.

Directly regulating what is said or distributed during an election, as § 211B.06 does, goes beyond an attempt to control the process to enhance the fairness overall so as to carefully protect the right to vote.  We concede that regulating falsity in the political realm definitely exemplifies a stronger state interest than, say, regulating the dissemination and content of information generally, given the importance of the electoral process in the United States.  McIntyre, 514 U.S. at 348-49.  Even in that context, however, the state does not have carte blanche to regulate the dissemination of false statements during political campaigns and the Supreme Court has yet to specifically weigh in on the balancing of interests when it does.  Id. at 349-50 n.12.

Today we need not determine whether, on these facts, preserving fair and honest elections and preventing fraud on the electorate comprise a compelling state interest because the narrow tailoring that must juxtapose that interest is absent here. Again, "[a] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon speech, when it leaves appreciable damage to that supposedly vital interest unprohibited."  White II, 416 F.3d at 750 (second alteration in original) (quotation omitted).  Accordingly, we turn to the "narrow tailoring" examination of § 211B.06.

### 2.    Narrowly Tailored

Even if we conclude that Minnesota has a compelling state interest in preserving "fair and honest" elections and preventing a "fraud upon the electorate," § 211B.06 fails under strict scrutiny. Under such inquiry, the requisite tailoring is determinative as to the statute's constitutionality because those making the laws may pursue stated interests "only so long as [they do] not unnecessarily infringe an individual's right to freedom of speech." McCutcheon, 134 S. Ct. at 1450 (plurality).

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

White II, 416 F.3d at 751.

Keeping Minnesota's alleged interests in mind, the First Amendment requires that the chosen restriction on the speech at issue be "actually necessary" to achieve them. Brown v. Entm't Merchants Ass'n, 131 S. Ct. 2729, 2738 (2011). "There must be a direct causal link between the restriction imposed and the injury to be prevented." Alvarez, 132 S. Ct. at 2549 (plurality). So, to survive strict scrutiny, Appellees must do more than assert a compelling state interest–they must demonstrate that § 211B.06 is narrowly tailored.

The county attorneys claim that § 211B.06 is indeed "actually necessary" to preserve fair and honest elections in Minnesota. They do so, however, without confirming that there is an actual, serious threat of individuals disseminating knowingly false statements concerning ballot initiatives. The county attorneys instead claim that empirical evidence is not required to support this legislative

judgment. Rather, they assert that common sense dictates "that political advertising aimed at voters and intentionally designed to induce a particular vote through the use of false facts impacts voters' understanding and perceptions; can influence their vote; and ultimately change an election." Because American elections employ secret ballots, Appellees continue (adopting the district court's reasoning), the effects of knowingly false statements do not lend themselves easily to empirical evidence. Accordingly, they argue, the statute is justified, reasonably, by its purpose in preventing fraud on the electorate through minimal regulations on knowingly false statements of fact.

Continuing in their defense of § 211B.06, the county attorneys argue that § 211B.06 is also not overbroad because it is narrowly tailored through its mens rea requirement of actual malice, achieved through the "knowingly false or reckless disregard of falsity" limitation. This mens rea requirement, they claim with reference to the district court's analysis of Garrison v. La., 379 U.S. 64, 75 (1964), provides the "breathing space" necessary to protect free speech, while narrowly tailoring the prohibition to further the state's interest. In that same vein, the county attorneys additionally claim that § 211B.06 is not underinclusive because it exempts "news items or editorial comments by the news media," Minn. Stat. § 211B.01 subd. 2, and is limited to "paid political advertising or campaign material," Minn. Stat. § 211B.06, subd. 1. Again, as did the district court, the county attorneys deduce that such an exemption is not only viewpoint neutral but recognizes the countervailing interests in a free press and keeps the government out of the editorial rooms while simultaneously targeting the problem–ballot-question advocates and opponents who pose a greater threat than the news media of disseminating intentionally false statements regarding the effect of a ballot question. This, too, according to the district court, allows for oral statements made in debates or "on the street corner soap box," made spontaneously or in the heat of the moment, such that these speakers

"need never curb their unscripted oral statements to avoid violating § 211B.06." And, finally, the county attorneys (as did the district court) conclude that § 211B.06 *is* the least restrictive alternative because even though counterspeech *could* be used, it is not as effective in achieving the legitimate purpose § 211B.06 was enacted to serve, especially after an election is over or towards the end of a campaign, when, apparently, the county attorneys believe § 211B.06 best serves the state's interest.

Each of these arguments fail under the required scrutiny. Previously stated, § 211B.06 is not narrowly tailored. First, because § 211B.06 perpetuates fraud, as discussed below, it is not actually necessary. It is also simultaneously overbroad and underinclusive. And, finally, it is not the least restrictive means of achieving the stated goals it allegedly advances. We address all of the areas.

Relying in part upon McIntyre, the district court held that § 211B.06 is actually necessary and "directly linked" to the harm sought to be prevented in Minnesota. In McIntyre, the Court evaluated the constitutionality of an Ohio statute prohibiting anonymous leafletting, another Ohio statute, also part of the Ohio Election Code recently discussed in SBA List. McIntyre, 514 U.S. at 338-39. The Court found the anonymous leafletting statute unconstitutional and in doing so, pointed to two Ohio false statements statutes, similar in kind to § 211B.06, as examples of statutes that more directly dealt with Ohio's professed interest in preventing fraud and libel in election campaigns.[11] Id. at 349-50. Because the challenged leafletting statute at

---

[11]The Court specifically pointed to Ohio Revised Code Annotated §§ 3599.09.1(B) and 3599.09.2(B) in Ohio's Election Code as statutes that include detailed and specific prohibitions against making or disseminating false statements during political campaigns, applying both to candidate elections and to issue-driven ballot measures. McIntyre, 514 U.S. at 349-50 n.12. Today, these provisions can be found at Ohio Revised Code Annotated. §§ 3517.21 and 3517.22. Section

-22-

issue in McIntyre was not the principal weapon against fraud, its "extremely broad prohibition" failed to satisfy strict scrutiny. Id. at 351.

The district court and the county attorneys rely upon McIntyre to establish that § 211B.06 is actually necessary and a "direct means" to counter the fraud of voter manipulation, but this takes McIntyre too far. The McIntyre Court expressly refrained from analyzing the constitutionality of the Ohio false statements statutes. Id. at 349-50 n.12 ("We need not, of course, evaluate the constitutionality of these provisions. We quote them merely to emphasize that Ohio has addressed directly the problem of election fraud."). The Court *only* noted the false statements statutes to illuminate the fact that Ohio had in existence *other* legislation that more directly addressed the professed interest in preventing fraud, simply as a means to establish that the leafletting statute at issue was not "necessary" in the endeavor. Id. at 349-53. To hold that McIntyre affirmatively *establishes* a statute like § 211B.06 is actually necessary to prevent voter deception greatly overstates McIntyre's holding.

However, the Court's discussion of particular statutes in the Ohio Election Code in McIntyre and SBA List provides us insight into this dispute. Neither case controls the consideration before us, as McIntyre expressly refrained from any decision regarding the constitutionality of Ohio's false statements statutes similar in kind to § 211B.06, and SBA List simply presented the Court with a standing challenge, mimicking the posture of this case in 281 Care Committee I. 281 Care Committee I, 638 F.3d at 627-31. But, each case in its own way delves into the realm of protected political speech and the ways states attempt to regulate in that arena. They are, therefore, useful to us.

---

3517.21(B) is the statute challenged in SBA List. SBA List, 134 S. Ct. at 2338.

-23-

Stated most simply, § 211B.06 does not survive strict scrutiny because it tends to perpetuate the very fraud it is allegedly designed to prohibit. For this reason, among others, the restriction is neither narrowly tailored nor necessary. In fact, it illustrates that the asserted compelling interest falls short. If § 211B.06 is truly intended, in part, to ensure "campaigns of decency" and "election of candidates to office[s] of honor and trust," as the county attorneys claim (in reliance upon Minnesota case law), the statute wholly misses the mark. Bank v. Egan, 60 N.W.2d 257, 262 (Minn. 1953). In fact, looking to the similar statutory scheme in Ohio, the Supreme Court in SBA List illuminated the many abuses that emanate from such an endeavor. SBA List, 134 S. Ct. at 2344-46. Just having a statute like § 211B.06 on the books creates an environment fraught with problems.

In SBA List, the Ohio Attorney General himself (Ohio AG), though charged simultaneously with the zealous representation of the Ohio Elections Commission in the same action, took the unique and rare step of filing an amicus brief as a "friend of the Court and the legal process" and as Ohio's "chief law officer" to enlighten the Court as to the "actual workings and effect of the Ohio false statements statute in practice." Brief of Amicus Curiae Ohio Attorney General Michael DeWine in Support of Neither Party at 1, 22, SBA List, 134 S. Ct. 2334 (No. 13-193), 2014 WL 880938 (Ohio AG Brief). Many of the concerns expressed by the Ohio AG made headway with the Court and resonate here as well. SBA List 134 S. Ct. at 2345-46 (relying upon the submission by the Ohio AG as to the practical effect of the Ohio false statements scheme).

First, as a practical matter, it is immensely problematic that *anyone* may lodge a complaint with the OAH alleging a violation of § 211B.06. There is no promise or requirement that the power to file a complaint will be used prudently. "Because the universe of potential complainants is not restricted to state officials who are

-24-

constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents." Id. at 2345. Complaints can be filed at a tactically calculated time so as to divert the attention of an entire campaign from the meritorious task at hand of supporting or defeating a ballot question, possibly diffusing public sentiment and requiring the speaker to defend a claim before the OAH, thus inflicting political damage.[12] Just as the Court explained in the context of the Ohio false statements statute, section § 211B.06 makes anyone speaking out about a ballot question "easy targets." Id. at 2345.

As previously noted, the county attorneys claim that empirical evidence is not needed to establish that § 211B.06 is actually necessary. However, their reliance upon "common sense" to establish that the use of false statements impacts voters' understanding, influences votes and ultimately changes elections, is not enough on

---

[12]The Ohio AG describes the inherent problems as well:

> It is not unduly cynical to suggest . . . that in at least some Elections Commission matters, complainants may time their submissions to achieve maximum disruption of their political opponents while calculating that an ultimate decision on the merits will be deferred until after the relevant election. . . . Even where the Commission does not find probable cause, the damage is often done. The speaker is forced to use time and resources responding to the complaint, typically at the exact moment that the campaign is peaking and his time and resources are best used elsewhere. In other words, the State has constructed a process that allows its enforcement mechanisms to be used to extract a cost from those seeking to speak out on elections, right at the most crucial time for that particular type of speech. And if the allegations turn out to be unfounded, there is no possibility of timely remedy.

Ohio AG Brief at 14-15.

these facts to establish a direct causal link between § 211B.06 and an interest in preserving fair and honest elections. Even though the effect of election fraud or detecting the fraud itself, arguably, is a bit more amorphous and difficult to detect, *only* relying upon common sensibilities to prove it is taking place still falls short. In Alvarez, the Court took the government to task for relying upon "common sense" to establish that its stated interest was at risk. 132 S. Ct. at 2549 (plurality). Certainly, it must be acknowledged that allowing an individual to disseminate political advertising that contains knowing falsehoods does not advance a fair and honest election. Yet merely relying upon common sense does not satisfy the heavy burden when protected speech is regulated. Id. We "have never accepted mere conjecture as adequate to carry a First Amendment burden." Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 392 (2000). Appellees defend the statute's ability to dissuade fraud with common sense, but is there such a problem that this infringement on protected speech must occur in the first instance? They argue that the law itself has been construed by Minnesota courts countless times but how often, in practice, is it put to use? Such conjecture about the effects and dangers of false statements equates to implausibility as far as this analysis goes, because, when the statute infringes core political speech, we tend to not take chances.

The Ohio AG addressed the reality of the problem head on and explained that by its nature, the "statutory scheme pulls within its ambit much protected speech." Ohio AG Brief at 18.

> Few respondents contest an adverse Commission finding in court because the election will be over, won or lost, by the time any judicial hearing takes place, and so the remedy is largely meaningless. Even if the speaker is ultimately victorious, that speaker gets little or nothing for his or her efforts but additional legal bills. Nevertheless, the few challenges that do take place demonstrate that the State administrative

-26-

> apparatus affects a good deal of speech that is well within the ambit of constitutionally protected speech, and that the remedy is rarely, if ever, a timely one.

Id. at 18. Between 2001 and 2010 in Ohio, for example, their Commission (the body in Ohio charged with similar duties as Minnesota's OAH to review these complaints) found violations of their respective false statements statute in 90 cases. Additionally,

> the Commission dismissed another forty-eight cases after a hearing, and 112 were dismissed because the complainant withdrew the complaint or failed to prosecute (typically after the election–a further indication that the goal may often be less an ultimate finding of a violation than a probable-cause finding before the election). Two hundred sixty were dismissed with findings of 'no probable cause.'

Ohio AG Brief at 20. The Ohio AG included such figures to illuminate that in reality "numerous speakers who have not made a false statement even under the modest burden of proof for 'probable cause,' are forced to devote time, resources, and energy defending themselves before the Elections Commission, typically in the late stages of a campaign." Id.

We do not cite to the Ohio AG statistical offerings to imply that just such empirical evidence is required to establish the causal link between § 211B.06 and the interests it is in place to protect. Nor do we cite the Ohio AG's explanation of how that state's false statements statutes are working in practice to imply that, in fact, the exact same reality must exist in Minnesota. The Ohio AG's explanation, however, clearly exemplifies the potential for abuse and an absence of narrow tailoring of the Minnesota law–and thus, a lack of necessity.

An affidavit submitted by the county attorneys in this matter avers that the Hennepin County Attorney's Office has not commenced any criminal prosecutions under § 211B.06 for false political and campaign material. The county attorneys have likewise filed copies of OAH decisions that have followed evidentiary hearings concerning § 211B.06 complaints, with varying findings concerning the challenged statements–some successful, some not. These exhibits, however, do not provide us with the bigger picture and thus we are at a loss to deduce any significance from their inclusion in the record except to establish that the OAH receives some complaints under § 211B.06, some of which are meritorious and others not. If anything, the sampling of orders exemplify that protected speech is being swept in by § 211B.06 unnecessarily, further establishing the chilling nature of this statute, as well as its overbreadth, which we turn to next.

For all practical purposes, the real potential damage is done at the time a complaint is filed, no matter the possibility of criminal prosecution down the line. The burdens of the OAH proceedings themselves greatly impact electoral speech and are cause for concern. Even before a probable cause hearing, the allegation of the falsity itself likely makes the news circuit and creates a stir in the ongoing political discourse. Practically, should probable cause be found by the ALJ when the complaint is filed close to an election, no judicial review can take place to effect any relief prior to the impending election. So, the damage is inflicted at the point of filing, even if the complainant is ultimately unable to prove up the allegations of falsity under the clear and convincing standard required during a resulting evidentiary hearing that would occur after a finding of probable cause. Minn. Stat. § 211B.32, subd. 4. Essentially, then, this damage (or injury) occurs quite easily, at the whim of "anyone" willing to file a complaint under oath. Minn. Stat. § 211B.32, subd. 3. Not only does this injury occur upon filing, it only deepens upon the finding of probable cause. At bottom, then, this core political speech is penalized using a

burden of proof even lower than a preponderance of the evidence, with few, if any, safeguards to protect this "zenith" of First Amendment-protected political speech. See Meyer v. Grant, 486 U.S. 414, 425 (1988).

The county attorneys seem to presume without question that "exaggerations, conjecture, or illogical inferences," which they claim is all Appellants wish to convey, are not within the scope of § 211B.06 and are thus not at risk. But, they cannot support such a claim. *Anyone* can file a complaint under § 211B.06 and it is only at that time that the OAH begins to decide whether a violation has occurred. At that point, however, damage is done, the extent which remains unseen. Section 211B.06 is thus overbroad because although it may seem axiomatic that particular speech does not fall within its scope, there is nothing to prohibit the filing of a complaint against speech that may later be found wholly protected. We have examples of just such protected speech in the record submitted by both sides, found within the OAH orders, both from prima facie determinations and following evidentiary hearings by a three-judge panel.[13]

---

[13]For example, the county attorneys filed OAH orders issued by three-judge administrative panels to demonstrate, in part, that no criminal prosecutions have taken place under § 211B.06 since the OAH process was put in place in 2004. These filings demonstrate civil challenges under § 211B.06 against false statements disseminated "with respect to the personal or political character or acts of a candidate," which are also actionable under § 211B.06 but are not at issue in this case. All of the orders, however, serve as examples of statements that get challenged nonetheless, even though they are either true or do not fall within the ambit of § 211B.06. One order filed by the county attorneys addresses a complaint filed by a citizens' group that supported passing a school bond referendum that challenged seventeen statements made in campaign material disseminated to urge voters to vote against the referendum. The complaint was filed under § 211B.06 and the statements were made in the context of a ballot initiative asking voters to vote on a $25.6 million bond

Notwithstanding its overbreadth, the lack of a causal link between the advanced interests and § 211B.06 is not the only way in which § 211B.06 is not actually necessary to achieve the stated interests. A second consideration in our analysis as to whether § 211B.06 is narrowly tailored to achieve Minnesota's asserted compelling interest in preserving fair and honest elections and preventing a fraud on the electorate, is that the county attorneys have not offered persuasive evidence to dispel the generally accepted proposition that counterspeech may be a logical solution to the interest advanced in this case. "[W]hen the Government seeks to regulate protected speech, the restriction must be the least restrictive means among available, effective alternatives." Alvarez, 132 S. Ct. at 2551 (plurality) (internal quotation omitted). There is no reason to presume that counterspeech would not suffice to achieve the interests advanced and is a less restrictive means, certainly, to achieve the same end goal.

---

referendum to finance a new school building. Fourteen of the alleged violations were dismissed at the outset by an ALJ making the initial inquiry and three survived the initial prima facie inquiry. Following the evidentiary hearing on those three statements, the OAH dismissed the entire complaint. Examples of challenged statements in connection with the referendum were: (1) "Like most Minnesotans, HLWW taxpayers saw their tax support of schools shift from property taxes to state income taxes a few years ago," (2) a statement that the particular delivery method chosen by the school district will "take the District out of the majority of the construction details, decisions and quality control" and (3) a statement by the respondent that "I have personally been offered a bribe by SGN Architect's – free tickets to the Twins game during the World Series." Following the month-long hearing process, the OAH panel ultimately held that each of these statements were either true, or merely statements of opinion that were not false, or were not made "with respect to the effect of a ballot question" as § 211B.06 requires.

The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uniformed, the enlightened; to the straight-out lie, the simple truth. . . . The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates.

Id. at 2550 (plurality).

Possibly there is no greater arena wherein counterspeech is at its most effective. It is the most immediate remedy to an allegation of falsity. "The theory of our Constitution is that the best test of truth is the power of the thought to get itself accepted in the competition of the market." Id. (internal quotation omitted). It is the citizenry that can discern for themselves what the truth is, not an ALJ behind doors. "The preferred First Amendment remedy of more speech, not enforced silence . . . has special force." Brown v. Hartlage, 456 U.S. 45, 61 (1982) (internal quotation omitted). Especially as to political speech, counterspeech is the tried and true buffer and elixir. Putting in place potential criminal sanctions and/or the possibility of being tied up in litigation before the OAH, or both, at the mere whim and mention from anyone who might oppose your view on a ballot question is wholly overbroad and overburdensome and chills otherwise protected speech. That counterspeech confronts these asserted compelling interests and is a less restrictive means of countering the concern leads us again to deduce that the interests are less compelling than touted and the statute is not narrowly tailored to achieve the goal.

-31-

Outside of counterspeech it is difficult at this point to envision other, less restrictive means to abate the alleged interest. No matter, however, because counterspeech, alone, establishes a viable less restrictive means of addressing the preservation of fair and honest elections in Minnesota and preventing fraud on the electorate. The county attorneys claim that counterspeech is not good enough to adequately address the concern because it cannot change the outcome of an election, nor can it effectively counter targeted communications with voters at the end of a campaign. The district court added that counterspeech may not be effective in the "David and Goliath" scenario when one group may so greatly outmatch a political opponent that the message, or correction, offered in response goes largely unheard. But these claims do not sufficiently respond to the use of counterspeech on these facts. The county attorneys simply do not acknowledge that if counterspeech does not suffice, § 211B.06 does not either. We have already pointed out the practical problems inherent with § 211B.06 and the reality regarding how it could actually perpetuate fraud in an election. Such realities cannot be ignored. If the genuine concern is to preserve fair and honest elections and prevent a fraud on the electorate, then it would seem that they, too, could not continue to keep § 211B.06 as part of a legislative scheme when the realities of its possible abuse are exposed. Section 211B.06 thus plainly fails the test of being the least restrictive means to serve the state's interest.

Another basis advanced by the county attorneys to demonstrate the narrow tailoring of § 211B.06 falls short. The mens rea requirement in § 211B.06 does not effectively narrow the statute to limit its reach as intended. The risk of chilling otherwise protected speech is not eliminated or lessened by the mens rea requirement because, as we have already noted, a speaker might still be concerned that someone will file a complaint with the OAH, or that they might even ultimately be prosecuted, for a careless false statement or possibly a truthful statement someone deems false,

no matter the speaker's veracity.  Or, most cynically, many might legitimately fear that no matter what they say, an opponent will utilize § 211B.06 to simply tie them up in litigation and smear their name or position on a particular matter, even if the speaker never had the intent required to render him liable.  See Alvarez, 132 S. Ct. at 2555 (Breyer, J., concurring) (discussing the similar chill inherent in the Stolen Valor Act, rendered unconstitutional by the Court).  The mens rea requirement in this context does not safeguard the statute's constitutionality nor deter someone from filing a complaint challenging statements involving exaggeration, rhetoric, figurative language, and unfavorable, misleading or illogical statements or opinions.  There is nothing in place to realistically stop the potential for abuse of § 211B.06's mechanisms.

Finally, the exemption for "news items or editorial comments by the news media," from the FCPA, § 211B.01 subd. 2, as well as § 211B.06's limitation to "paid political advertising or campaign material," actually exemplify that § 211B.06 is underinclusive.  The former, the county attorneys argue, protects the countervailing interests in a free press, and the latter, the district court points out, allows for oral statements in debates and on television, along with spontaneous soapbox pronouncements and other such speech that includes "unscripted oral statements," without fear of reprisal.  First, to claim that a statement made during a debate is spontaneous and unscripted, and thus should receive greater leeway, is disingenuous at best, in a day when many political speakers take the greatest pains to be politically correct at all times, carefully crafting, in advance, every statement they make in the political arena.  Applying their logic regarding the effect of such speech, to allow the "dissemination" (albeit orally) of these statements outside the confines of § 211B.06 leaves equally injurious speech untouched, although it is capable of inflicting the same harm, say, as that included in a published campaign pamphlet.  Appellants' example of the hypocrisy that can occur under this scheme perhaps best illustrates the

problem, although we alter their example slightly. Overlaying the press exemption with the statutory restrictions, we envision a newspaper opinion section which, on the same day, prints the very same "false" information regarding the effects of a ballot question twice–once as an editorial and again in a paid advertisement from a local group opposing the initiative. One is exempt from prosecution and the other is not. Such a result does not advance a stated interest in preventing a fraud on the electorate.

It is in the political arena where robust discourse must take place. And although there *are* certain outright falsities one could envision in the discussion of a proposed ballot question, especially when considering there are hotly debated sides to every issue, it seems that too often in that situation, the "falsity" deemed by one person actionable under § 211B.06 will be a statement of conjecture about the future state of affairs should the ballot question pass or fail. Despite the certainty of conjecture, however, the state may not prevent others from "resort[ing] to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement." Cantwell v. Conn., 310 U.S. 296, 310 (1940). Such "back and forth" is the way of the world in election discourse. "[S]ome false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation . . . ." Alvarez, 132 S. Ct. at 2544 (plurality). We therefore leave room for the rough and tumble of political discourse for the farfetched. "[P]olitical speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse." McIntyre, 514 U.S. at 357.

The county attorneys claim that § 211B.06 actually serves its purpose most fervently at the end of a campaign or even after an election is over. This claim is wholly without merit. Given the information exposed by the Ohio AG and our own

-34-

analysis of § 211B.06, it is possible that it is at *that* point that § 211B.06 can be utilized to induce the most damage to the state interest it is designed to serve. As asserted by the Ohio AG, who is charged with the task of enforcing the similar statutory scheme, these laws "allow[] the State's legal machinery to be used extensively by private actors to gain political advantage in circumstances where malicious falsity cannot ultimately be established." Ohio AG Brief at 7.

Given these realities, the county attorneys have failed to demonstrate that § 211B.06 is either narrowly tailored or necessary to preserve fair and honest elections and prevent a fraud on the electorate. The mens rea requirement established in the statute, and any other alleged narrowing safeguards that Appellees claim render this statute constitutional, have little effect in abating the advanced concern of the state. Citing Minnesota law, the county attorneys claim that the legislative intent of § 211B.06 is to prevent corrupt campaign practices that would "mislead the public and permit close elections . . . to be won by fraud." In re Contest of Gen. Election, 264 N.W. 2d 401, 406 (Minn. 1978) (Otis, J., dissenting). But as we have discussed, the practical application of § 211B.06 only opens the door to more fraud. The statute itself actually opens a Pandora's box to disingenuous politicking itself.

While we would like to agree with the district court that because § 211B.06 employs "the force and impartiality of law," it "serves to check the unfair use of disparate advantage during a campaign," we do not have the luxury of indulging that scenario given the abridgement of core political speech at risk. With such abridgement left unregulated, not only is § 211B.06 not narrowly tailored but likely does not rise to the level of explicating a "compelling" interest. The citizenry, not the government, should be the monitor of falseness in the political arena. Citizens can digest and question writings or broadcasts in favor or against ballot initiatives just as they are equally poised to weigh counterpoints. McIntyre, 514 U.S. at 348 n.11

("People are intelligent enough to evaluate the source of an anonymous writing. They can see it is anonymous. They know it is anonymous. They can evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message. And then, once they have done so, it is for them to decide what is responsible, what is valuable, and what is truth.") (quotation omitted).

## F.    Eleventh Amendment Immunity

The attorney general revisits the issue of Eleventh Amendment immunity. In 281 Care Committee I, we held that the attorney general was a proper defendant under the Ex parte Young, 209 U.S. 123 (1908), exception to Eleventh Amendment immunity. 638 F.3d at 632. We determined that the attorney general's connection to the enforcement of § 211B.06 was three-fold: (1) the attorney general "may, upon request of the county attorney assigned to a case, become involved in a criminal prosecution of section 211B.06," (2) "the attorney general is responsible for defending the decisions of the OAH–including decisions pursuant to section 211B.06–if they are challenged in civil court," and (3) "the attorney general appears to have the ability to file a civil complaint under section 211B.06." Id. This connection, we held, was sufficient to make the attorney general amenable to suit under the Ex parte Young exception to Eleventh Amendment immunity. Id. at 633. The district court did not directly address this immunity issue when it granted summary judgment in favor of the county attorneys upon remand because it dismissed the claims. The district court did intimate, however, that this court's original denial of immunity "appears to have the same force of reason at the summary judgment stage as at the motion to dismiss stage."

On appeal, the attorney general reiterates that she may initiate a prosecution for violation of § 211B.06 only "[u]pon request of the county attorney" and only if the

attorney general then "deems [it] proper." Minn. Stat. § 8.01. Violations of the statute are prosecuted by county attorneys, not the attorney general. Minn. Stat. § 211B.16, subd. 3. In support of the motion for summary judgment the Deputy Minnesota Attorney General filed an affidavit testifying that (1) the attorney general's office has never initiated a prosecution alleging a violation of § 211B.06 and he was not aware of any county attorney ever requesting the office to do so, (2) the attorney general's office would decline any request to prosecute any of the activities described in the amended complaint as a violation of § 211B.06, and (3) the attorney general's office never has filed, and has no intention of ever filing, a complaint with the OAH alleging a violation of § 211B.06, especially based upon any of the activities in which the parties wish to engage, as stated in the first amended complaint. Accordingly, the attorney general argues that the record now establishes that there is no threat of her enforcing the challenged criminal statute against Appellants.

The Ex parte Young exception only applies against officials "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution." Ex parte Young, 209 U.S. at 156. It is the attorney general's now-established (via affidavit), not speculative, unwillingness to exercise her ability to prosecute a § 211B.06 claim against Appellants that carries the day at this stage in the proceedings. Kitchen v. Herbert, 755 F.3d 1193, 1201 (10th Cir. 2014) ("An officer need not have a special connection to the allegedly unconstitutional statute; rather, he need only have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.") (quotation omitted). "The Ex parte Young doctrine does not apply when the defendant official has neither enforced nor threatened to enforce the statute challenged as unconstitutional." McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery, 226 F.3d 429, 438 (6th Cir. 2000); Okpalobi v. Foster, 244 F.3d 405, 417 (5th Cir. 2001) ("[A]ny probe into the existence of a

Young exception should gauge (1) the ability of the official to enforce the statute at issue under his statutory or constitutional powers, and (2) the demonstrated willingness of the official to enforce the statute."). "Absent a real likelihood that the state official will employ his supervisory powers against plaintiffs' interests, the Eleventh Amendment bars federal court jurisdiction." Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir. 1992) (per curiam).

At this stage in the proceedings we are no longer concerned with who is "a *potentially* proper party for injunctive relief" but rather who in fact is the right party. Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon, 428 F.3d 1139, 1146 (8th Cir. 2005) (alteration in original). Now that the attorney general has testified with assurances that the office will not take up its discretionary ability to assist in the prosecution of § 211B.06, Appellants are not subject to or threatened with any enforcement proceeding by the attorney general. Thus, we find the attorney general immune from suit under the Eleventh Amendment, and, accordingly, dismiss the action as against the attorney general.

III.   CONCLUSION

For the reasons stated herein, we dismiss Lori Swanson, in her official capacity as the Minnesota Attorney General, and reverse and remand for further proceedings consistent with this opinion.

_____