NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11830

COMMONWEALTH  vs.  MELISSA LUCAS.


Suffolk.    May 7, 2015. - August 6, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Constitutional Law, Freedom of speech and press, Elections.
    Statute, Validity.



    Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on February 11, 2015.

    The case was reported by Duffly, J.



    Peter Charles Horstmann for the defendant.
    Amy Spector, Assistant Attorney General, for the
Commonwealth.
    The following submitted briefs for amici curiae:
    Andrew Sellars & Christopher Bavitz for New England First
Amendment Coalition & others.
    H. Reed Witherby, Matthew R. Segal, & Sarah R. Wunsch for
American Civil Liberties Union of Massachusetts.
    Ben Robbins & Martin J. Newhouse for New England Legal
Foundation.
    Russell C. Reeves, Kathryn M. Harrison, & Austin C. Reeves,
pro se.
    Ilya Shapiro & Gabriel Latner, of the District of Columbia,
& David Duncan for Cato Institute.

CORDY, J.  This case concerns the constitutionality of G. L. c. 56, § 42 (§ 42), which criminalizes certain false statements about political candidates or questions submitted to voters.[1]  Melissa Lucas was charged with violating the statute after her political action committee published brochures criticizing a candidate for public office.  For the reasons set forth below, we conclude that § 42, on its face, is inconsistent with the fundamental right of free speech guaranteed by art. 16 of the Massachusetts Declaration of Rights.  Accordingly, the statute is invalid and the criminal complaint charging Lucas with violating it must be dismissed.[2]

---

[1] General Laws c. 56, § 42 (§ 42), provides:

"No person shall make or publish, or cause to be made or published, any false statement in relation to any candidate for nomination or election to public office, which is designed or tends to aid or to injure or defeat such candidate.

"No person shall publish or cause to be published in any letter, circular, advertisement, poster or in any other writing any false statement in relation to any question submitted to the voters, which statement is designed to affect the vote on said question.

"Whoever knowingly violates any provision of this section shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than six months."

[2] We acknowledge the amicus curiae briefs submitted by the American Civil Liberties Union of Massachusetts; the Cato Institute; the New England Legal Foundation; the New England First Amendment Coalition, Boston Globe Media Partners, LLC, Massachusetts Newspaper Publishers Association, Hearst

1. <u>Background</u>. In October, 2014, Jobs First Independent Expenditure Political Action Committee (PAC) published and distributed brochures urging voters to vote against Brian Mannal, the incumbent candidate for State Representative for the Second Barnstable District. In the brochures, the PAC made several statements about Mannal, including:

> "Brian Mannal chose convicted felons over the safety of our families. Is this the kind of person we want representing us?";
>
> "Helping Himself: Lawyer Brian Mannal has earned nearly $140,000 of our tax dollars to represent criminals. Now he wants to use our tax dollars to pay defense lawyers like himself to help convicted sex offenders"; and
>
> "Brian Mannal is putting criminals and his own interest above our families."

On October 21, 2014, approximately two weeks prior to the general election, Mannal responded by filing an application for a criminal complaint in the Barnstable Division of the District Court Department against Lucas, the PAC's chairwoman and treasurer. In the application, Mannal alleged that Lucas published knowingly false statements designed to defeat Mannal's candidacy in violation of § 42. Mannal held a press conference announcing the filing and published a media advisory further

---

Television, Inc., New England Newspaper and Press Association, Inc., and New England Society of Newspaper Editors; and Russell C. Reeves, Kathryn M. Harrison, and Austin C. Reeves.

detailing the reasons for the criminal complaint against Lucas and suggesting that the brochures "could put her behind bars."

On October 27, 2014, Lucas filed a motion to dismiss the application on the ground that § 42 is an unconstitutional restraint on free speech. A probable cause hearing was scheduled for November 20, 2014 -- approximately two weeks after the general election. Mannal won reelection by a margin of 205 votes. After the election, Lucas and the PAC filed an emergency motion for a preliminary injunction in the United States District Court for the District of Massachusetts seeking to have the probable cause hearing stayed and § 42 declared unconstitutional. At the preliminary injunction hearing, the PAC presented evidence that it had refrained from airing a radio advertisement as a result of Mannal's application and that it would continue to refrain from certain political advocacy until the constitutionality and scope of § 42 were clarified.[3] A judge in the Federal court denied relief pursuant to the doctrine of abstention. See Younger v. Harris, 401 U.S. 37, 41 (1971)

---

[3] The withheld advertisement stated: "As a mother, I'm worried about how State Rep. Brian Mannal is making my family less safe. He filed a bill to make GPS monitoring optional for some sex offenders. That's a bipartisan public safety law that he's trying to undo. Then, he sponsored a bill to help sex offenders qualify for taxpayer funded lawyers. That's the last thing I want my tax dollars spent on. I want a State Representative who will keep my family safe -- not help sex offenders. And that's why I'm voting against Brian Mannal."

("national policy forbid[s] federal courts to stay or enjoin pending state court proceedings except under special circumstances"). The United States Court of Appeals for the First Circuit affirmed.

After a transfer of venue in the State criminal proceedings, a probable cause hearing was held in the Falmouth Division of the District Court Department on December 18, 2014 -- more than one month after the election. Following the hearing, a clerk-magistrate issued a criminal complaint formally charging Lucas with two counts of violating § 42. Lucas has not yet been arraigned and there has not been a ruling on her motion to dismiss. In February, 2015, Lucas filed a petition in the county court pursuant to G. L. c. 211, § 3, seeking relief from the criminal complaint on the ground that § 42 is unconstitutional. The single justice stayed the underlying criminal proceedings and reserved and reported the matter to the full court.

2. Discussion. a. Threshold questions. The Commonwealth argues that we should decline to address the constitutionality of § 42 in this case.[4] The Commonwealth's first argument is that

---

[4] The Commonwealth is represented in this proceeding by the Attorney General pursuant to G. L. c. 12, § 3. The district attorney handling the prosecution of Lucas declined to file a brief, but submitted a letter requesting that the court determine the constitutionality of § 42.

the extraordinary relief afforded by G. L. c. 211, § 3, is unavailable because Lucas has an alternative remedy in the form of a motion to dismiss the criminal complaint. See, e.g., Maza v. Commonwealth, 423 Mass. 1006, 1006 (1996) ("request for relief under G. L. c. 211, § 3, is properly denied where the petitioning party has or had adequate and effective avenues other than G. L. c. 211, § 3, by which to seek and obtain the requested relief"). This argument is unpersuasive because, "where, as here, a single justice of this court reserves and reports an interlocutory matter to this court, we grant the litigant full appellate review." Burke v. Commonwealth, 373 Mass. 157, 159 (1977).

Alternatively, the Commonwealth argues that we should dismiss the complaint against Lucas on statutory, rather than constitutional, grounds because the statements at issue were opinions outside the scope of § 42. See Cole v. Westinghouse Broadcasting Co., 386 Mass. 303, 312, cert. denied, 459 U.S. 1037 (1982) (opinions could not be proved false and therefore were not actionable as libel); Aldrich v. Boyle, 328 Mass. 30, 32 (1951) (political advertisement was "customary type of hortatory appeal commonly made to voters at election time" and not actionable). The Commonwealth recites the familiar rule that we decline to consider the constitutionality of a statute that does not criminalize a defendant's conduct. See, e.g.,

*Commonwealth* v. *Robertson*, 467 Mass. 371, 381 (2014).  Yet, in some contexts, resolving a case on narrower grounds may serve to perpetuate the chilling of speech protected by the First Amendment to the United States Constitution and art. 16, as amended by art. 77 of the Amendments.  See generally *Commonwealth* v. *Bohmer*, 374 Mass. 368, 373 (1978).  As the United States Supreme Court has observed, this concern may be particularly acute in the context of an election:

> "It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held.  There are short timeframes in which speech can have influence.  The need or relevance of the speech will often first be apparent at this stage in the campaign.  The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others.  A speaker's ability to engage in political speech that could have a chance of persuading voters is stifled if the speaker must first commence a protracted lawsuit.  By the time the lawsuit concludes, the election will be over and the litigants in most cases will have neither the incentive nor, perhaps, the resources to carry on, even if they could establish that the case is not moot because the issue is 'capable of repetition, yet evading review.'"

*Citizens United* v. *Federal Election Comm'n*, 558 U.S. 310, 334 (2010), quoting *Federal Election Comm'n* v. *Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007).

These observations have substantial force here.  Assuming, arguendo, that § 42 proscribes only statements of fact as opposed to opinion and the statements at issue constituted opinion, a political candidate was nonetheless able to use those statements as the basis for an application for a criminal

complaint (and ultimately for its issuance). The candidate then used the application as a political tool not only to discredit the statements but also to persuade the PAC to refrain from airing a political advertisement shortly before the election. Although Lucas filed a motion to dismiss the application, Mannal already had won the election by a narrow margin by the time of the probable cause hearing. Thus, even if the application had been dismissed, the damage was already done. See 281 Care Comm. v. Arneson, 766 F.3d 774, 790 & n.12 (8th Cir. 2014), cert. denied, 135 S. Ct. 1550 (2015) ("State has constructed a process that allows its enforcement mechanisms to be used to extract a cost from those seeking to speak out on elections, right at the most crucial time for that particular type of speech. And if the allegations turn out to be unfounded, there is no possibility of timely remedy" [citation omitted]).

Importantly, this precise scenario is capable of repetition yet constantly evading review on the Commonwealth's theory that § 42 does not apply to the particular facts of a given case. This is so because anyone may initiate a complaint under § 42 and, in so doing, create lingering uncertainties of a criminal investigation and chill political speech by virtue of the process itself. See United States v. Alvarez, 132 S. Ct. 2537, 2553 (2012) (Breyer, J., concurring) ("threat of criminal prosecution for making a false statement can inhibit the speaker

from making true statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart").  See also Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2347 (2014) (political organization had standing to challenge constitutionality of statute criminalizing false campaign speech).  Because "a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated," Citizens United, 558 U.S. at 336, we decline to dismiss this case on statutory grounds without first considering whether the statute is, in fact, constitutional.

b.  Constitutionality of § 42.  i.  Protection of political speech.  Our constitutional system "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.  To many this is, and always will be, folly; but we have staked upon it our all.'"  New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964), quoting United States v. Associated Press, 52 F. Supp. 362, 372 (S.D.N.Y. 1943).[5]  As a general proposition, therefore, any attempt by the government to restrict speech "because of its message, its ideas, its subject matter, or its content" is

---

[5] See art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments ("The right of free speech shall not be abridged"); First Amendment to the United States Constitution (First Amendment) ("Congress shall make no law . . . abridging the freedom of speech").

presumptively invalid and the burden is on the government to establish its constitutionality.  Alvarez, 132 S. Ct. at 2543-2544, quoting Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002).  See Mendoza v. Licensing Bd. of Fall River, 444 Mass. 188, 197 n.12 (2005).  These principles have their "'fullest and most urgent application' to speech uttered during a campaign for political office."  Arizona Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806, 2817 (2011), quoting Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 223 (1989).  See generally Opinion of the Justices, 387 Mass. 1201, 1202 (1982), quoting Colo v. Treasurer & Receiver Gen., 378 Mass. 550, 558 (1979) ("criteria which have been established by the United States Supreme Court for judging claims arising under the First Amendment . . . are equally appropriate to claims brought under cognate provisions of the Massachusetts Constitution").

Yet, the fact that "speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution."  Garrison v. Louisiana, 379 U.S. 64, 75 (1964).  Statements made during the fervor of a political campaign may fall within those "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional

problem."[6]  Chaplinsky v. New Hampshire, 315 U.S. 568, 571–572
(1942).  See New York Times Co., 376 U.S. at 268-269.  The
Commonwealth contends that the campaign speech proscribed by
§ 42 falls within two of these classes:  fraud, see Virginia
State Bd. of Pharmacy v. Virginia Citizens Consumer Council,
Inc., 425 U.S. 748, 771 (1976), and defamation, see New York
Times Co., supra at 283; and is, thus, not entitled to
constitutional protection.  We disagree.  The fact "that these
areas of speech can, consistently with the First Amendment, be
regulated because of their constitutionally proscribable content
. . . [does] not [mean] that they are categories of speech
entirely invisible to the Constitution, so that they may be made
the vehicles for content discrimination unrelated to their
distinctively proscribable content" (emphasis omitted).  R.A.V.
v. St. Paul, 505 U.S. 377, 383-384 (1992).  In others words,
statutes that proscribe both protected and unprotected speech
are not categorically removed from constitutional scrutiny.

The Commonwealth's interest in preventing and punishing
election fraud remains relevant to the inquiry into the

---

[6] Within these classes of unprotected speech, which include
obscenity, defamation, fraud, incitement, and speech integral to
criminal conduct, United States v. Stevens, 559 U.S. 460, 468-
470 (2010), "'the evil to be restricted so overwhelmingly
outweighs the expressive interests, if any, at stake, that no
process of case-by-case adjudication is required,' because 'the
balance of competing interests is clearly struck.'"  Id. at 470,
quoting New York v. Ferber, 458 U.S. 747, 763-764 (1982).

statute's constitutionality.  See Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 637 (1980).  But any legitimate interest in preventing electoral fraud must be done by narrowly drawn laws designed to serve those interests without unnecessarily interfering with First Amendment freedoms.  Id. The elements of fraud are "[1] a false representation of material fact, [2] with knowledge of its falsity, [3] for the purpose of inducing the plaintiffs to act on this representation, [4] that the plaintiffs reasonably relied on the representation as true, and [5] that they acted upon it to their damage."  Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 471 (2009).[7]  Section 42 plainly does not require a showing of reliance or damage.  See Alvarez, 132 S. Ct. at 2554 (Breyer, J., concurring) ("Fraud statutes, for example, typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury"). Contrast Illinois ex rel. Madigan v. Telemarketing Assocs., Inc., 538 U.S. 600, 620 (2003) (law targeting fraudulent charitable solicitations fell within fraud exception where it required "demonstrat[ion] that the defendant made the representation with the intent to mislead the listener, and succeeded in doing so").  Thus, the fact that § 42 may reach

---

[7] See Commonwealth v. Leonard, 352 Mass. 636, 644-645 (1967) (larceny by false pretenses has same elements).

fraudulent speech is not dispositive, because it also reaches speech that is not fraudulent.[8] See <u>United States</u> v. <u>Williams</u>, 553 U.S. 285, 316 n.2 (2008) (Souter, J., dissenting) ("fact that fraud is a separate category of speech which independently lacks First Amendment protection changes the analysis with regard to such proposals, although it does not necessarily dictate the conclusion. The Court has placed limits on the policing of fraud when it cuts too far into other protected speech"). Consequently, § 42 does not fit within the categorical exception for the regulation of fraudulent speech. See generally <u>R.A.V.</u>, 505 U.S. at 384.

The Commonwealth's attempt to shoehorn § 42 into the exception for defamatory speech is similarly flawed. "To prevail on a claim of defamation, a plaintiff must establish that [1] the defendant was at fault for the publication of a false statement regarding the plaintiff, [2] capable of damaging

---

[8] The Commonwealth contends that fraudulent speech may nonetheless be unprotected absent a showing of concrete harm where the speech threatens "the integrity of Government processes." <u>United States</u> v. <u>Alvarez</u>, 132 S. Ct. 2537, 2546 (2012). However, the Commonwealth has not established that the range of speech proscribed by § 42 poses an actual and substantial threat to the electoral process. See <u>281 Care Comm.</u> v. <u>Arneson</u>, 766 F.3d 774, 790 (8th Cir. 2014), cert. denied, 135 S. Ct. 1550 (2015) ("reliance upon 'common sense' to establish that the use of false statements impacts voters' understanding, influences votes and ultimately changes elections, is not enough on these facts to establish a direct causal link between [the statute] and an interest in preserving fair and honest elections").

the plaintiff's reputation in the community, [3] which either caused economic loss or is actionable without proof of economic loss." White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004). Additionally, a defamatory statement against a candidate for public office is actionable only if is made with "actual malice."[9] Lane v. MPG Newspapers, 438 Mass. 476, 479 (2003). See New York Times Co., 376 U.S. at 283 (civil); Garrison, 379 U.S. at 74 (criminal). Although § 42 is capable of reaching such defamatory statements, it is also capable of reaching statements regarding ballot questions and statements by a candidate about himself designed to enhance his own candidacy, i.e., statements that clearly are not defamatory. See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 352 n.16 (1995), quoting People v. White, 116 Ill. 2d 171, 180 (1987) ("A public question clearly cannot be the victim of character assassination"). As a result, § 42 does not fit within the categorical exception for the regulation of defamatory speech. See generally R.A.V., 505 U.S. at 384.

Finding no historical exception into which § 42 may comfortably fit, we next consider whether the statute imposes a restraint on the content of protected speech. "A statute is

---

[9] Actual malice means either knowledge that the statement made was false or reckless disregard for whether it was false or not. New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964).

content neutral only if 'it is justified without reference to the content of the regulated speech.'"  Opinion of the Justices, 436 Mass. 1201, 1206 (2002), quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  Section 42 proscribes false statements whose content is designed to affect candidates and ballot issues.  Because the "applicability of the [statute's] requirements can only be determined by reviewing the contents of the proposed expression, the [statute] is a content-based regulation of speech."  Opinion of the Justices, 436 Mass. at 1206.  Accordingly, § 42 is presumptively invalid and the Commonwealth bears the heavy burden of establishing its constitutionality.  See Mendoza, 444 Mass. at 197 n.12.

ii.  Level of scrutiny.  The parties dispute the level of constitutional scrutiny that we should apply to § 42.  Lucas argues that strict scrutiny is appropriate because the statute regulates the content of protected speech.  See, e.g., United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 814 (2000) ("As we consider a content-based regulation, the answer should be clear:  The standard is strict scrutiny").  The Commonwealth advocates for an intermediate level of scrutiny; that is, whether the statute "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests."  Turner Broadcasting Sys., Inc. v. Federal

Communications Comm'n, 520 U.S. 180, 189 (1997). The United States Supreme Court has applied intermediate scrutiny in a variety of contexts, including content-neutral regulations, United States v. O'Brien, 391 U.S. 367, 376-377 (1968); prohibitions on commercial speech, Thompson v. Western States Med. Ctr., 535 U.S. 357, 367 (2002); and "reasonable, nondiscriminatory restrictions" on voting, Burdick v. Takushi, 504 U.S. 428, 434 (1992), quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983). The Commonwealth's position is that intermediate scrutiny is required here as well, in light of Justice Breyer's concurring opinion in Alvarez, 132 S. Ct. at 2551-2552, which it casts as the narrowest and therefore controlling opinion in that case. See Marks v. United States, 430 U.S. 188, 193 (1977), quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . .'").

In Alvarez, six justices of the Supreme Court agreed that the Stolen Valor Act, which made it a crime to claim falsely receipt of the Congressional Medal of Honor, violated the First Amendment. Alvarez, supra at 2543, 2551. The justices did not agree, however, as to the appropriate level of constitutional

scrutiny.  A plurality of four justices concluded that because the statute regulated the content of protected speech, it was subject to the "most exacting scrutiny."  Id. at 2548, quoting Turner Broadcasting Sys., Inc. v. Federal Communications Comm'n, 512 U.S. 622, 642 (1994).  In contrast, the two concurring justices concluded that the more flexible intermediate level of scrutiny was appropriate because the statute did not encroach on a subject matter that traditionally has called for strict scrutiny.  Id. at 2552.  In light of this reasoning, we find it doubtful that the concurring opinion of two justices in Alvarez abrogated the well-established line of First Amendment precedent holding that content-based restrictions of political speech must withstand strict scrutiny.  Accord 281 Care Comm., 766 F.3d at 782 (concluding that Alvarez did not alter level of scrutiny applied to regulation of political speech).  See, e.g., Arizona Free Enter. Club's Freedom Club PAC, 131 S. Ct. at 2817, quoting Citizens United, 558 U.S. at 340 ("'Laws that burden political speech are' accordingly 'subject to strict scrutiny'"); Boos v. Barry, 485 U.S. 312, 321 (1988) ("a content-based restriction on political speech in a public forum . . . must be subjected to the most exacting scrutiny" [emphasis omitted]).[10]

_____

[10] Following oral argument in the present case, the United States Supreme Court issued its decision in Reed v. Gilbert, 135 S. Ct. 2218 (2015).  That case involved a signage regulation that treated categories of signs differently depending on their

In any event, we need not enter that fray because, under our Declaration of Rights, the applicable standard for content-based restrictions on political speech is clearly strict scrutiny.  See Bachrach v. Secretary of the Commonwealth, 382 Mass. 268, 276 (1981) ("As a substantial restriction of political expression and association . . . the legislation at bar should attract 'strict scrutiny'").  See also First Nat'l Bank v. Attorney Gen., 362 Mass. 570, 587 (1972) ("Legislature has the power to regulate elections in order to prevent bribery, fraud and corruption to the end that the people's right to vote may be protected. . . .  But such regulation must be narrowly drawn to meet the precise evil sought to be curbed").  See generally Roman v. Trustees of Tufts College, 461 Mass. 707, 713 (2012), quoting Batchelder v. Allied Stores Int'l, Inc., 388

_____

content.  Id. at 2224-2225.  The Court observed that the regulation was "content based on its face. . . .  It defines 'Political Signs' on the basis of whether a sign's message is 'designed to influence the outcome of an election.'"  Id. at 2227.  The Court held unanimously that the regulation violated the First Amendment.  See id. at 2232.  See also id. at 2236 (Kagan, J., concurring in the judgment).  Although three of the concurring justices questioned the application of strict scrutiny, six justices agreed that strict scrutiny was the proper standard.  See id. at 2236, 2239 (Kagan, J., concurring in the judgment).  See also id. at 2231 ("obvious content-based inquiry does not evade strict scrutiny review simply because an event [i.e., an election] is involved").  The Reed case casts additional doubt on the Commonwealth's position in the present case that the Supreme Court would apply intermediate scrutiny to the content-based restriction of political speech imposed by § 42.

Mass. 83, 89 n. 8 (1983), S.C., 393 Mass. 819 (1985) ("we have rejected the assertion that art. 16 can 'extend no further than the comparable provisions of the First Amendment'").  "We adhere to the principle that this court will exercise its independent judgment to uphold the cherished protections of the Declaration of Rights as a matter of State constitutional law."  Mendoza, 444 Mass. at 201.  Accordingly, we now turn to whether § 42 can withstand strict scrutiny under art. 16.

 iii.  Scrutiny under art. 16.  In order for § 42 to withstand strict scrutiny, the government must establish that the statute is both "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end."  Opinion of the Justices, 436 Mass. at 1206, quoting Simon & Schuster, Inc. v. New York Crime Victims Bd., 502 U.S. 105, 118 (1991).[11] The Commonwealth argues that it has a compelling interest in the maintenance of free and fair elections.  As a general matter, we agree.  See art. 9 of the Massachusetts Declaration of Rights ("All elections ought to be free"); Opinion of the Justices, 385 Mass. 1201, 1206 (1982) ("Commonwealth unquestionably has a compelling interest in the over-all regularity of the election process"); Anderson v. Boston, 376 Mass. 178, 193, appeal

---

[11] Although we decide this case under art. 16, we draw on First Amendment jurisprudence insofar as it is instructive of the application of the strict scrutiny standard.

dismissed, 439 U.S. 951 (1978) ("Commonwealth has a substantial, compelling interest in assuring the fairness of elections and the appearance of fairness in the electoral process"). See also Eu, 489 U.S. at 231 ("A State indisputably has a compelling interest in preserving the integrity of its election process"). We also agree that this interest includes efforts by the government to thwart political corruption, voter intimidation, and election fraud. See Cepulonis v. Secretary of the Commonwealth, 389 Mass. 930, 935-936 (1983). See also Burson v. Freeman, 504 U.S. 191, 208 (1992) (opinion of Blackmun, J.). However, the Commonwealth "does not have carte blanche to regulate the dissemination of false statements during political campaigns," 281 Care Comm., 766 F.3d at 787, and its "claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." Id., quoting Eu, supra at 228.

In this case, such skepticism is well founded, as the Commonwealth has not established that § 42 actually is necessary to serve the compelling interest of fair and free elections. Suppose, for example, that a candidate makes the following false statement at a preelection debate: "I received the Congressional Medal of Honor." This constitutes (1) a false statement, (2) made about a candidate, (3) designed to aid that candidate win an election, and therefore a crime pursuant to

§ 42.  Such a result raises serious doubts about the constitutionality of § 42 in light of <u>Alvarez</u>, 132 S. Ct. at 2551 (striking down on First Amendment grounds Federal statute criminalizing false Medal of Honor claims).  <u>Alvarez</u> teaches that the criminalization of such falsehoods is unnecessary because a remedy already exists:  "the simple truth."  <u>Id</u>. at 2550.

Courts in other jurisdictions have applied this same principle to conclude that statutes broadly suppressing false statements about candidates or ballot questions cannot withstand strict scrutiny for the simple reason that "[o]ur constitutional election system already contains the solution to the problem that [such statutes are] meant to address."  <u>Rickert</u> v. <u>Public Disclosure Comm'n</u>, 161 Wash. 2d 843, 855 (2007) (en banc).  That solution is counterspeech.  See <u>id</u>. ("In a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent" [quotations and citations omitted]); <u>281 Care Comm</u>., 766 F.3d at 793 ("Especially as to political speech, counterspeech is the tried and true buffer and elixir").  Governmental efforts to supplant political counterspeech with the specter of incarceration date back to the earliest years of our constitutional democracy.  The Sedition Act of 1798, c. 74, 1 Stat. 596, enacted by Congress just seven years after the

ratification of the First Amendment, made it a crime to "knowingly and willingly assist or aid in writing, printing, uttering or publishing any false, scandalous and malicious writing or writings against the government of the United States . . . with intent to defame the said government . . . or to bring [it] . . . into contempt or disrepute." Id. at § 2. In 1799, the Legislature issued a declaration of support for the Sedition Act. Jenkins, The Sedition Act of 1798 and the Incorporation of Seditious Libel into First Amendment Jurisprudence, 45 Am. J. Legal Hist. 154, 172 (2001). In the election of 1800, however, the unconstitutionality of the Sedition Act was a prominent theme in Thomas Jefferson's successful campaign for the presidency. See Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131, 1149-1150 (1991). As the Supreme Court has observed, history has proven Jefferson right. See New York Times Co., 376 U.S. at 274-276. The fabric of jurisprudence woven across the years following the passage of the Sedition Act and, indeed, § 42 has illustrated vividly that the importance of preserving "the freedom to think for ourselves," Citizens United, 558 U.S. at 356, must be elevated over even those well-intentioned laws that have the effect of "censoring pure speech or speakers in order to 'improve the quality' or 'increase the fairness' of public debate." Bachrach, 382 Mass. at 281, quoting Cox, The Supreme Court 1979

Term Forward: Freedom of Expression in the Burger Court, 94 Harv. L. Rev. 1, 67 (1980).

The Commonwealth attempts to distinguish these principles with the rather remarkable argument that the election context gives the government broader authority to restrict speech. The opposite is true. See, e.g., Weld for Governor v. Director of the Office of Campaign & Political Fin., 407 Mass. 761, 769 (1990), quoting Buckley v. Valeo, 424 U.S. 1, 15 (1976) ("First Amendment rights of speech and association have their 'fullest and most urgent application precisely to the conduct of campaigns for political office'"); Anderson, 376 Mass. at 191 n.14 ("open discussion of political candidates and elections is basic First Amendment material. Government domination of the expression of ideas is repugnant to our system of constitutional government"). See also Meyer v. Grant, 486 U.S. 414, 425 (1988) ("the speech at issue is 'at the core of our electoral process and of the First Amendment freedoms,' . . . an area of public policy where protection of robust discussion is at its zenith" [citation omitted]). Thus, in Commonwealth v. Dennis, 368 Mass. 92, 92 (1975), we struck down a similar statute, G. L. c. 56, § 41, which made it a crime to distribute anonymous pamphlets "designed to aid or to defeat any candidate for nomination or election to any public office or any question submitted to the voters." We observed that there was "significant authority that

a disclosure requirement relating to election pamphlets cannot survive a First Amendment challenge," Dennis, supra at 98, notwithstanding the government's constitutional interest in ensuring fair and free elections.  See art. 9.

Equally remarkable is the Commonwealth's reliance on the Citizens United case to defend greater restrictions on election speech.  In that case, the Supreme Court departed from precedent to strike down on First Amendment grounds a Federal statute restricting the ability of corporations to make political expenditures from general treasury funds.  Citizens United, 558 U.S. at 318-319, 372.  The Commonwealth contends that, as a result of this decision, heavily funded groups are now able to skew political discourse so as to render counterspeech an ineffective remedy for falsehood.[12]  Regardless of the essential impact of Citizens United on the democratic process, that decision does not provide any support for reducing the constitutional protection afforded core political speech.

_____

[12] We note that the use of calculated falsehoods and vitriolic rhetoric to sway elections long predates the Supreme Court's decision in Citizens United v. Federal Election Comm'n, 558 U.S. 310 (2010).  The election of 1800, discussed supra, is particularly notable in this regard, with supporters of Thomas Jefferson referring to John Adams as a "hideous hermaphroditical character which has neither the force or firmness of a man, nor the gentleness and sensibility of a woman," and supporters of Adams referring to Jefferson as "the son of a half-breed Indian squaw, sired by a Virginia mulatto father."  Shugerman, The Golden or Bronze Age of Judicial Selection?, 100 Iowa L. Rev. Bull. 69, 74 (2015).

Latching on to language from McIntyre, 514 U.S. at 349, that "[t]he state interest in preventing fraud and libel . . . carries special weight during election campaigns," the Commonwealth points out that § 42 reaches falsehoods far more insidious and difficult to discredit on the eve of an election than, for example, the lie uttered in Alvarez.  Accordingly, the argument goes, § 42 is necessary because, in contrast to Alvarez, the shortened time frame of an election may render the truth an ineffective remedy.  This point is well taken, but nonetheless fails because, like the statute at issue in McIntyre, § 42 is not narrowly tailored.  McIntyre, supra at 357 (striking down on First Amendment grounds State statute prohibiting anonymous political leafletting).

Section 42 applies not only to elections of public officers, but also to ballot issues.  See McIntyre, supra at 351-352.  It may be invoked as soon as one announces his or her candidacy -- not merely on the eve of the election.  Cf. id. at 352 ("It applies not only to leaflets distributed on the eve of an election, when the opportunity for reply is limited, but also to those distributed months in advance").  It reaches not only those statements that are widely disseminated through commercial advertisement, but also those exchanged between two friends engaged in a spirited political discussion in a local pub.  Cf. id. at 351 ("It applies not only to the activities of candidates

and their organized supporters, but also to individuals acting independently and using only their own modest resources"); Alvarez, supra at 2555 (Breyer, J., concurring) ("the prohibition may be applied where it should not be applied, for example, to bar stool braggadocio or, in the political arena, subtly but selectively to speakers that the Government does not like"). Moreover, as reflected in the Medal of Honor hypothetical, it applies to a broad range of content that does not pose a realistic threat to the maintenance of fair and free elections. Cf. McIntyre, supra at 351 ("Although these ancillary benefits are assuredly legitimate, we are not persuaded that they justify [the statute's] extremely broad prohibition"). Thus, the more apt observation from McIntyre is this: "The State may, and does, punish fraud directly. But it cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented." Id. at 357. See State ex rel. Public Disclosure Comm'n v. 119 Vote No! Comm., 135 Wash. 2d 618, 630 (1998) (en banc) ("the State asserts McIntyre impliedly suggested laws prohibiting false political statements are constitutional. However the inference to be drawn from McIntyre is just the opposite").

As the facts of this case demonstrate, the danger of such breadth is that the statute may be manipulated easily into a

tool for subverting its own justification, i.e., the fairness and freedom of the electoral process, through the chilling of core political speech.  See First Nat'l Bank v. Attorney Gen., 362 Mass. 570, 587-588 (1972), quoting United States v. Congress of Indus. Orgs., 335 U.S. 106, 155 (1948) (Rutledge, J., concurring) ("A statute which, in the claimed interest of free and honest elections, curtails the very freedoms that make possible exercise of the franchise by an informed and thinking electorate, and does this by . . . serving as a prior restraint upon expression not in fact forbidden as well as upon what is, cannot be squared with the First Amendment").  See also Alvarez, 132 S. Ct. at 2550 ("suppression of speech by the government can make exposure of falsity more difficult, not less so"); 281 Care Comm., 766 F.3d at 796 ("statute itself actually opens a Pandora's box to disingenuous politicking"); 119 Vote No! Comm., 135 Wash. 2d at 626, 627, quoting McIntyre, 514 U.S. at 352 n.16 ("a well-publicized, yet bogus, complaint to the [commission] on election eve raises the same concern [as 'an eleventh-hour anonymous smear campaign']").

The Commonwealth suggests that we could curb this danger by narrowly construing § 42 to regulate only fraudulent and defamatory speech.  Although the statute could be narrowly construed in some respects, it is not amenable to the construction proposed by the Commonwealth, see Blixt v. Blixt,

437 Mass. 649, 674 (2002), quoting <u>School Comm. of Greenfield</u> v. <u>Greenfield Educ. Ass'n</u>, 385 Mass. 70, 79 (1982) ("It is our duty to construe statutes so as to avoid such constitutional difficulties, <u>if reasonable principles of interpretation permit it</u>");[13] and even if we were to read the statute narrowly to encompass only knowingly false statements of fact, the distinction between fact and opinion is not always obvious and, evidently, was not obvious to the clerk-magistrate who issued the criminal complaint in this case.  See <u>King</u> v. <u>Globe Newspaper Co</u>., 400 Mass. 705, 709 (1987) ("it is much easier to recognize the significance of the distinction between statements of opinion and statements of fact than it is to make the

---

[13] For example, although the language of the statute does not expressly limit its reach to false statements of fact, we could imply such a limitation from the principle that an opinion cannot be proven false.  See <u>Rotkiewicz</u> v. <u>Sadowsky</u>, 431 Mass. 748, 756 (2000) ("subjective statements of opinion . . . were not susceptible of being proven false").  Similarly, although the statute does not expressly require that the publisher of the statement know of its falsity, we could imply such a limitation from the principle that statutes criminalizing speech should be construed to include a scienter requirement.  See <u>Commonwealth</u> v. <u>Jones</u>, 471 Mass. 138, 143 (2015).  What we will not do, however, is interpret the statute in a way that is plainly contrary to its language.  See <u>Blixt</u> v. <u>Blixt</u>, 437 Mass. 649, 674 (2002), cert. denied, 537 U.S. 1189 (2013), quoting <u>Mile Rd. Corp</u>. v. <u>Boston</u>, 345 Mass. 379, 383, appeal dismissed, 373 U.S. 541 (1963) ("A statute, of course, must be construed, if possible, to avoid serious constitutional doubts.  This principle, however, does not authorize the judiciary to supply qualifying words not fairly to be imported from the actual language of the statute").  As explained above, the plain language of § 42 criminalizes an array of false statements that extend well beyond fraud and defamation.

distinction in a particular case").  "[S]uch a determination itself may be viewed [by the electorate] as a sanction by the State" [quotation and citation omitted].  Susan B. Anthony List, 134 S. Ct. at 2346.

Moreover, even in cases involving seemingly obvious statements of political fact, distinguishing between truth and falsity may prove exceedingly difficult.  Assertions regarding a candidate's voting record on a particular issue may very well require an in-depth analysis of legislative history that will often be ill-suited to the compressed time frame of an election. Thus, in the election context, as elsewhere, it is apparent "that the ultimate good desired is better reached by free trade in ideas -- that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which [the people's] wishes safely can be carried out.  That at any rate is the theory of our Constitution."  Lyons v. Globe Newspaper Co., 415 Mass. 258, 268 (1993), quoting Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).  See 281 Care Comm., 766 F.3d at 796 ("citizenry, not the government, should be the monitor of falseness in the political arena").

The foregoing problems make it all the more concerning that anyone may file an application for a criminal complaint under § 42.  See 281 Care Comm., 766 F.3d at 790.  The risk inherent

in such an environment is that an individual, unconstrained by the ethical obligations imposed on government officials, will file an unmeritorious application "at a tactically calculated time so as to divert the attention of an entire campaign from the meritorious task at hand of supporting or defeating a ballot question [or candidate]."  Id.  See Susan B. Anthony List, 134 S. Ct. at 2345 ("Because the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents").  See generally Mass. R. Prof. C. 3.8 comment 1, 426 Mass. 1397 (1998) ("prosecutor has the responsibility of a minister of justice").  As was the case here, by the time of the probable cause hearing the election may well be over and the damage will be done.  See 281 Care Comm., 766 F.3d at 792.  Thus, even under a narrow construction, there is a genuine risk that the operation of § 42 will cast an unacceptable chill on core political speech.  The statute cannot withstand strict scrutiny.[14]

3.  Conclusion.  We conclude that § 42 cannot be limited to the criminalization of fraudulent or defamatory speech, is neither necessary nor narrowly tailored to advancing the

---

[14] To the extent that a contrary conclusion could be drawn from our passing reference to § 42 in Opinion of the Justices, 363 Mass. 909, 916 (1973), that conclusion is overruled.

Commonwealth's interest in fair and free elections, and chills the very exchange of ideas that gives meaning to our electoral system.  For all of these reasons, we hold that § 42 is antagonistic to the fundamental right of free speech enshrined in art. 16 of our Declaration of Rights and, therefore, is invalid.  Accordingly, the criminal complaint charging Lucas with violating § 42 must be dismissed.

<u>So ordered</u>.