Duffly, J.
(dissenting, with whom Spina and Hines, JJ., join). I *574 agree with the court that the defendant’s conviction of criminal harassment under G. L. c. 265, § 43A (§ 43A), as to Michael Costello, should be reversed because the evidence introduced at trial, in Michael’s own words, did not establish that he was “seriously alarm[ed]” by receipt of the defendant’s letter on at least three of the occasions that he received one.[1]
I write separately because I do not agree with the court’s conclusion that the defendant’s conviction as to Michael’s wife, Susan Costello, based on speech in letters directed to her, is supported under the court’s prior, long-standing definition of what constitutes a “true threat.” See Virginia v. Black, 538 U.S. 343, 359-360 (2003). The court maintains that its decision to expand the reach of the types of speech that now will be labeled unprotected “true threats” “comports with the general intent of the First Amendment to the United States Constitution to bar the government from infringing on the freedom of speech, one of the fundamental personal rights and liberties.” Ante at note 12. In reality, however, the court today removes large quantities of heretofore protected speech from any constitutional protection. Rather than expanding the definition of what constitutes a true threat, as the court does today, I would instead consider whether the defendant’s speech, even if protected, may still subject him to conviction under § 43A, because the statute serves “a compelling state interest” and is “narrowly drawn to achieve that end” (citation omitted). See Commonwealth v. Lucas, 472 Mass. 387, 398 (2015); id. at 393, quoting R.A.V. v. St. Paul, 505 U.S. 377, 383-384 (1992) (“The fact ‘that these areas of speech can, consistently with the First Amendment, be regulated because of their constitutionally proscribable content.... [does] not [mean] that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content’1). See Ward v. Rock Against Racism, 491 U.S. 781, 803 (1989); Commonwealth v. A Juvenile, 368 Mass. 580, 584 (1975) (under First Amendment, review of crime that regulates speech requires strict scrutiny).
Until now, “true threats” have been defined as being limited to
“those cases where the defendant expresses an intention to inflict a crime on another, has the ability to carry out that *575 crime, causes the victim to fear harm, and does so in circumstances that make the victim’s fear justifiable.”
Commonwealth v. Sholley, 432 Mass. 721, 727 (2000), cert. denied, 532 U.S. 980 (2001). Cf. O’Brien v. Borowski, 461 Mass. 415, 425 (2012) (discussing § 43A in case involving civil harassment statute, G. L. c. 258E, and stating that true threats do not require ‘“direct threats of imminent physical harm,” where, ‘“taking into account the context in which they arise,” words or actions would ‘“cause the victim to fear such harm now or in the future and evince intent on the part of the speaker or actor to cause such fear”). We have recognized these limitations to be necessary so that ‘“the offense of threatening to commit a crime only reaches cases of ‘true threats’ that would not qualify as protected speech.” Commonwealth v. Sholley, supra. Whether direct or indirect, the common denominator has been a threat of physical harm to the person, “now or in the future.” O’Brien v. Borowski, supra. See ante at note 20, quoting Virginia v. Black, 538 U.S. at 360 (“a prohibition on true threats ‘protecfis] individuals from the fear of violence’ and ‘from the disruption that fear engenders,’ in addition to protecting people ‘from the possibility that the threatened violence will occur’ ” [citations omitted]). Under the court’s analysis today, however, henceforth speech will be considered unprotected if the statements, “viewed contextually,” could be found to increase the “potential to instill [in an intended target] a fear of future harm,” because the recipient is unable to determine the speaker’s intent.[2] See ante at 568.
The court’s expansion of what heretofore have been “well- *576 defined and narrowly limited classes of’ constitutionally unprotected speech, O’Brien v. Borowski, supra at 422 (citation omitted), results essentially in the creation of a broad and amorphous category of unprotected speech. Where the conduct at issue is speech, it also effectively eviscerates a critical difference between the criminal harassment statute and the stalking statute (criminalizing “[wjhoever [1] willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress, and [2] makes a threat with the intent to place the person in imminent fear of death or bodily injury”). See G. L. c. 265, § 43 (a); Commonwealth v. Walters, 472 Mass. 680, 691 (2015) (“Comparing the definition of ‘true threat’ to the threat component of the stalking statute, we conclude that any verbal or written communication that qualifies as a threat as defined in the statute is also a ‘true threat,’ and therefore is not entitled to protection under the First Amendment”).
The court does not explain the nature of the threatened crime it sees reflected in the letters sent to the Costellos, or in those sections of the letters it deems directed particularly at Susan, and does not state whether the threat is a threat to cause physical harm to Michael or to Susan.[3] Nor, despite its efforts to distinguish specific portions of the letters as directed at one or the other, does it explain how statements in a letter addressed to a husband and wife, in their home, are protected political speech as to him, while, as to her, the statements constitute constitutionally unprotected speech that leaves the defendant subject to criminal liability not only under § 43A, but presumably under other criminal statutes such as G. L. c. 275, § 2, threatening to commit a crime. See Commonwealth v. Sholley, supra. Instead, in the court’s view, *577 because the letters were anonymous, Susan was unable to evaluate the nature of the author’s intent, which the court posits is sufficient to instill a greatly increased fear of future harm. Ante at 568. Thus, Susan’s imagination as to what the author might have been intending is now enough to “cause the victim to fear [physical] harm,” O’Brien v. Borowski, supra at 425, a far cry from the well-established definition of a true threat discussed in Commonwealth v. Sholley, supra.[4] This cannot be what the framers intended in drafting the First Amendment.
*578 The court’s attempt to distinguish the speech in the letters it deems directed at Susan rather than at Michael (although the parties, here and at trial, treated all of the letters as having been sent to both Michael and Susan) does not provide the support it seeks in this distinction. If Susan were the intended victim, a threat to her, communicated in a letter to Michael, with the reasonable expectation that he would communicate it to her, is no less a true threat than one sent to Susan directly, and whether the statement constituted a true threat (as opposed to whether the defendant’s conduct met the requirements of § 43A) is determined based on an objective, reasonable person standard. See, e.g., Commonwealth v. James, 73 Mass. App. Ct. 383, 385-387 (2008), and cases cited (“When a defendant utters a threat to a third party who would likely communicate it to the ultimate target, the defendant’s act constitutes evidence of his intent to communicate the threat to the intended victim”). Similarly, a threat to Michael, delivered in a letter addressed to Susan, would likewise be a true threat.
The court sees a statement in the fourth letter, addressed to Susan and accompanied by a newspaper article about the Attorney General’s investigation of Michael and his “abuses,” as potentially a true threat to her.[5] See ante at 557, 567-568. Applying the court’s analysis, however, it would appear equally likely to be a potential threat to Michael, intended to be communicated through Susan. Similarly, the fifth letter, addressed to “Lorraine,” in an envelope addressed to “Susan ‘The Maid’ Costello,” also contained comments about Michael’s performance as a selectman that might be viewed as a threat under the court’s analysis, and that seemingly were intended to be communicated to him.[6] In addition, both the first and second letters stated that the defendant intended their content to be distributed publically.[7] See Commonwealth v. Walters, 472 Mass. 680, 693 *579 (2015), and cases cited (“Where communication of the threat is indirect — for example, through an intermediary — the Commonwealth must prove beyond a reasonable doubt that the defendant intended the threat to reach the victim”). In any event, a “true threat” is no less a threat because it involves a political subject or is directed at a politician. See Virginia v. Black, 538 U.S. 343, 358-361 (2003); Watts v. United States, 394 U.S. 705, 707-708 (1969) (per curiam).
The result of the court’s decision today — under which the same language, in an anonymous letter directed at an individual in the privacy of his or her home, may be political speech that is accorded the highest constitutional protection, or unprotected speech, depending on whether the reader holds an elected office — will be “a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their [own] personal predilections” (citation omitted).[8] Commonwealth v. Williams, 395 Mass. 302, 304 (1985).[9] Based on this expansive view of a “true threat,” no reasonable person would be able to ascertain the nature of the prohibited conduct to be avoided so as not to be subject to criminal liability. Conduct that is so broad and vague that it is not readily discemable cannot constitutionally support a criminal conviction.
A conclusion that the speech at issue here is constitutionally protected, however, need not, in my view, preclude prosecution of the defendant under § 43A as to the conduct directed at Susan. That a government regulation may reach protected speech does not alone render it unconstitutional. See Frisby v. Schultz, 487 U.S. 474, 484-488 (1988), and cases cited. See, e.g., Burson v. Freeman, 504 U.S. 191, 198, 209-210 (1992) (one hundred foot *580 restriction on political speech near polling sites necessary to serve “compelling State interest” and “narrowly drawn to achieve that end” [citation omitted]); Ward v. Rock Against Racism, 491 U.S. 781, 803 (1989) (upholding regulation of constitutionally protected speech); Lehman v. Shaker Heights, 418 U.S. 298, 302-303 (1974), and cases cited (“Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question”).
Although the court’s decision in Commonwealth v. Welch, 444 Mass. 80, 98-100 (2005), commented that it would “no[t] hesi-tare]” to interpret the language of § 43A as applicable only to constitutionally unprotected speech, more specifically only to true threats, because it considered such a narrowing necessary in order to deem § 43A as constitutional, that statement was made in circumstances quite distinct from those confronting the court here.[10] While the court states today that it must interpret § 43A as applicable only to unprotected speech, such as a true threat, or the provision would run afoul of constitutional protections, I do not agree that constitutionally protected speech must, in all circumstances, categorically be excluded from prosecution under § 43A, given that the statute considers specific types of harassing speech in conjunction with a pattern of conduct or series of acts. The United States Supreme Court has noted that “the States are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called ‘fighting words,’ ” Cohen v. California, 403 U.S. 15, 20 (1971), citing Chaplinsky v. New Hampshire, 315 U.S. 568 (1942), but government also retains the ability, “consonant with the Constitution, to shut off discourse solely to protect others from hearing it . . . upon a showing that substantial privacy interests are being invaded in an essentially *581 intolerable manner,” even where the speech at issue otherwise would be entitled to constitutional protection. Cohen v. California, supra at 21. A conclusion that § 43A may never apply to protected speech is inconsistent with these well-established principles, and would eviscerate the legislative purpose underlying its enactment.
The Legislature enacted § 43A in order to provide ‘“a remedy to [stalking] victims before ‘nonthreatening ’ harassment escalates into life-threatening assault.” Welch, supra at 100. The provision ‘“was passed in response to a perceived loophole in the stalking statute,” which ‘“left without remedy those victims plagued by harassment that, although potentially dangerous, did not include an overt ‘threat’ and thus was not actionable under existing law.” Id. at 87-88. “ ‘[ S |talkcrs who become lethal move from nonthreatening behavior to direct threats . . . ’ and ‘criminal harassment law establishes a continuum along which law enforcement may confront stalking behaviors.’ ” Id. at 100, quoting Kirkman, Every Breath You Take: Massachusetts Steps up Its Efforts to Stop Stalkers, 85 Mass. L. Rev. 174, 181, 183 (2001). It would be reasonable to conclude that, with the enactment of the criminal harassment statute, the Commonwealth need not wait until it is too late to protect victims of potentially dangerous violent crimes, and that, under ordinary tenets of First Amendment jurisprudence, the Commonwealth has demonstrated a compelling interest in criminalizing conduct and speech that does not include a true threat but, nonetheless, is “potentially dangerous” as contemplated by § 43A. Welch, supra at 88. Cf. United States v. Salerno, 481 U.S. 739, 749 (1987).
A conviction under § 43A requires proof that “(1) the defendant engaged in a knowing pattern of conduct or speech, or series of acts, on at least three separate occasions; (2) the defendant intended to target the victim with the harassing conduct or speech, or series of acts, on each occasion; (3) the conduct or speech, or series of acts, were of such a nature that they seriously alarmed the victim; (4) the conduct or speech, or series of acts, were of such a nature that they would cause a reasonable person to suffer substantial emotional distress; and (5) the defendant committed the conduct or speech, or series of acts, ‘willfully and maliciously.’ ” Commonwealth v. Johnson, 470 Mass. 300, 307 (2014), quoting Commonwealth v. McDonald, 462 Mass. 236, 240 (2012). The requirement of the criminal harassment statute that speech be “directed at” one victim, on at least three occa *582 sions, removes the majority of protected speech from the statute’s reach, and ensures, in the plain language of the statute, that § 43A will not apply to any speaker who disseminates a political, religious, or other protected message to a general audience, albeit that the message contains vulgar, offensive, or disturbing speech. Cf. Frisby v. Schultz, 487 U.S. 474, 483 (1998). Additionally, to support a conviction under § 43A, the fact finder must determine that each of the three acts to which liability attaches would be understood as “harassing” by a reasonable person, ensuring that a defendant is not “at the mercy of a hearer’s sensitivities.” Commonwealth v. Johnson, supra at 308. Cf. Texas v. Johnson, 491 U.S. 397, 409 (1989) (distinguishing between expressions of dissatisfaction with political policies and direct personal insults); Van Liew v. Stansfield, 474 Mass. 31, 38-39 (2016) (addressing insults about local public official’s performance as political speech). Thus, rather than the expansion of the meaning of a “true threat” that the court undertakes, § 43A could be viewed as adequately ensuring that constitutionally protected speech is not penalized, while, at the same time, avoiding “negating] the Legislature’s clear attempt to protect victims of harassment before that behavior escalates into more dangerous conduct.”[11] See Commonwealth v. O’Neil, 67 Mass. App. Ct. 284, 293 (2006).
Given this, there is no need to pursue the path the court chooses today, by stretching the meaning of “true threat” far beyond common understanding, removing broad swaths of speech from constitutional protection and imposing potential criminal liability on statements that might, in another’s eyes, seem merely rude and offensive.

 Because Michael Costello and Susan Costello share the same last name, I refer to them by their' first names.

 The court notes that a jury may consider “surrounding facts that provide context” in order to find that a defendant’s speech or conduct “constituted a direct threat.” See ante at note 26. Compare Spence v. Washington, 418 U.S. 405, 409-410 (1974) (defendant’s activity of hanging marked flag from his bedroom window, combined with factual context, “lead to the conclusion that he engaged in a form of protected expression”). While the court asks the jury to determine whether, given the unspecified “context” it must consider, the defendant’s speech to Susan constituted a true threat, “[t]he inquiry into the protected status of speech is one of law, not fact.” Connick v. Myers, 461 U.S. 138, 148 n.7 (1983). The limits of each unprotected category of speech “have been determined by the judicial evaluation of special facts that have been deemed to have constitutional significance.” Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 505 (1984). A court will review “to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited.” Id.

 The court describes the speech directed at Susan in the last two letters as containing “vulgar and hateful insults” in language that could “reflectf ] ... an obsessive interest in” private matters, “especially her marital relationship.” Ante at 568. The court does not explain the nature of the threatened harm to Susan’s “personal safety” that it sees reflected in those sections of the letters, and how a jury could find that the statements constitute “a serious expression of an intent to commit an act of unlawful violence to a particular' individual or group of individuals.” See Virginia v. Black. 538 U.S. 343, 359 (2003). The court also appeal's to disregard the fact that, in the letter in which the statements about Susan’s husband were made, the defendant asked in the same portion of the letter how Susan could continue to support “such a bum” remaining in his role as a selectman. See discussion, infra.

 Compare, for example, the court’s statement in Commonwealth v. Walters, 472 Mass. 680, 695-696 (2015), regarding what may constitute a “true threat” within the meaning of the First Amendment to the United States Constitution, in reviewing a conviction under the stalking statute, G. L. c. 265, § 43 (a):
“Turning to the quotation on the page, ‘[m]ake no mistake of my will to succeed in bringing you two idiots to justice,’ in the circumstances of this case, it is reasonable to interpret the ‘two idiots’ as referring to the victim and [her boy friend]. But even if one reads the sentence in combination with the photograph of the defendant, any particular' violent message that might be attributed to the defendant from the presence of these two elements on the same page is speculative. Although the photograph depicts the defendant holding a gun, nothing else about that image suggests a clear intent to commit violence. Furthermore, like the photograph, the word ‘justice’ is amenable to a reasonable, nonviolent interpretation, namely, that the defendant intended to pursue whatever legal means might be available to right wrongs he perceived the victim and [her boy friend] had inflicted on him. . . .
“Finally, the Commonwealth asserted during oral argument that, given the limited total number of items on the defendant’s Facebook profile page, the combined presence of (1) the photograph of the defendant with a gun, (2) the quotation about justice, (3) the reference to Rihanna [a well-known singer and survivor of domestic violence], and (4) the reference to the ‘Governors . . . Task Force on Police Corruption,’ suggested that the page could have had little meaning except to project the appearance of a threat against the victim and [her boy friend]. We agree that the page as a whole could have come across as vaguely ominous or disturbing. However, because no evidence was introduced at trial regarding the defendant’s opinion of or even knowledge about Rihanna, or about whether the defendant did or did not participate in a task force on police corruption, we question whether it is reasonable to ascribe to these items the meaning that the Commonwealth suggests, and to then infer that the defendant in fact created and intended to use the page to place the victim in imminent fear of bodily harm. Ultimately, based on the trial record, we conclude that the evidence of the defendant’s intent concerning the creation of the Facebook profile was insufficient with respect both to whether the page constituted a threat within the scope of § 43 (a) (2) and to the reasonableness of the victim’s fear.”

 The court’s reference is to the statement that “[t]he authorities will continue to hound [Michael] until you and he can’t stand it anymore. Maybe you will have to live like Whitey Bulger frequenting plastic surgeons to have any hope of a peaceful lifestyle. The only difference is Whitey has unlimited funds and you don’t.” See ante at 557.

 The letter stated, as the court notes, that Michael “forged title to his wife’s caif,] set fire to his wife’s house with her in it[,] [and] screwed the cleaning lady then married her,” but continues, “Lorraine — how stupid can you be to support such a bum — this is a reflection on you too.”

 “This letter will be all over town by then as well as at the selectmenf’s] meeting”; “This is such a good letter I think I will send it around and post it at Vino’s.”

 It is not clear, for example, whether, under the court’s analysis, if Susan were an elected member of the town’s school committee, the letter involving Michael’ s conduct as a selectman would, as to her, be transformed from an unprotected “true threat” to protected political speech.

 The court states that it considers, in large part, different portions of the language in that letter, or different letters, with respect to its determination whether the content was directed to Michael or to Susan. See ante at note 14. This purported distinction cannot be sustained. It is not clear how a recipient of a letter addressed to “Mr. and Mrs. Costello,” as some of the letters were, or addressed in some form to Susan, containing content evidently intended to be shared with Michael, would know which portions of the letter were “directed” to him or her. See id. It is particularly unclear how a recipient would understand that a letter addressed to Susan actually was “directed” at Michael, see ante at 556, or how one letter, addressed to a husband and wife, actually was only directed at the wife, as the court concludes. See ante at note 14.

 In Commonwealth v. Welch, 444 Mass. 80, 82-83 (2005), the factual context before the court involved a question of pure speech, where the offense statements were made in public. This was the lens through which the court considered what the Legislature must have intended in order to render § 43A sufficiently narrow to pass constitutional muster. In O’Brien v. Borowski, 461 Mass. 415, 425 n.7 (2012), the court held that, in Welch, it “erred in concluding that the criminal harassment statute was limited in its reach to ‘fighting words.’ ” To the extent that Welch interpreted § 43A as applicable only to constitutionally unprotected speech, in my view, that decision was improvident and should be revisited.

 “Typically, stalking behaviors involve obsessional attractions to victims and are not necessarily intended to harm or frighten them.” Commonwealth v. O’Neil, 67 Mass. App. Ct. 284, 293 (2006).